28 F.3d 1501
 63 USLW 2059, 92 Ed. Law Rep. 1148
 The GOOD NEWS/GOOD SPORTS CLUB, an unincorporated
association; Jordan Heimburger, a minor, by his next friend
L. Corbett Heimburger; Christopher Hirt, a minor, by his
next friend Peggy Hirt; David Hirt, a minor, by his next
friend Peggy Hirt; Comfort Ibe, a minor, by her next friend
Afocha Ngozi Ibe; Peggy Hirt; John Hirt; Susan Mallory;
George Mallory; Larry Tychsen; Dawn Huffman; Gabor
Csengody; Afocha Ngozi Ibe; Kathryn Heimburger; L.
Corbett Heimburger, Appellants,
v.
SCHOOL DISTRICT, OF the CITY OF LADUE, a public corporation;
Barbara Sacks; Charles H. Cobaugh; Joyce
Follman; Robert Minkler; Ann Boon;
Charles McKenna, Appellees.
Center for Law and Religious Freedom, Amicus Curiae,
American Jewish Congress; Americans United for Separation
of Church and State, Amici Curiae.
 No. 93-2148.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 13, 1993.
Decided July 12, 1994.
Rehearing and Suggestion for Rehearing En Banc Denied Sept.
29, 1994.*
 
 Carl H. Esbeck, Columbia, MO, argued (Timothy Belz, St. Louis, MO, on the brief), for appellants.
 Robert G. McClintock, St. Louis, MO, argued (John Gianoulakis and Robert A. Useted, on the brief), for appellees.
 Before MAGILL, Circuit Judge, BRIGHT, Senior Circuit Judge, and BEAM, Circuit Judge.
 MAGILL, Circuit Judge.
 
 
 1
 The Good News/Good Sports Club (the Club) and individuals affiliated with the Club[1] appeal the district court's judgment denying their challenge to the use-of-premises policy (Amended Use Policy) of the School District of the City of Ladue, Missouri (School District) that closes the School District's facilities between 3 and 6 p.m. on school days to all community groups except for the Scouts[2] and athletic groups. The Amended Use Policy also contains a proviso that prohibits the Scouts from engaging in any religious speech from 3 to 6 p.m. Because the Amended Use Policy results in viewpoint discrimination that does not serve a compelling governmental interest, we reverse the judgment of the district court.
 
 I. BACKGROUND
 
 2
 The Club is a community-based, non-affiliated group that seeks to foster the moral development of junior high school students from the perspective of Christian religious values. Club advertisements state that the Club is not sponsored by the School District. Parent volunteers run the Club meetings. The Club is open to junior high school students regardless of their race, creed, denomination, or sex. The Club does require, however, parental consent before a student may attend a meeting. Club activities include skits, singing (including Christian songs), role playing, Bible reading, prayer, and speeches by community role models. The Club is religious, but non-denominational.
 
 
 3
 The Club first met at the Ladue Junior High School in late 1988 and continued to meet through Spring 1992. During the 1991-92 school year, the Club's meetings took place on the first Monday of each month from 3 to 3:55 p.m. The timing of the meetings was convenient to Club members and their parents because the students could take the late bus home. In total, the Club met eight times during the 1991-92 school year.
 
 
 4
 In February 1992, several residents of the School District attended a school board meeting and complained about the religious content of the Club's meetings. The school board asked its attorney to evaluate the present use policy (1986 Use Policy) in response to the complaints against the Club. In late March, the school board passed a resolution allowing the Club to continue meeting for the remainder of the year. In July, the school board adopted the Amended Use Policy that closed the School District to all community groups, except the Scouts and athletic groups, between 3 and 6 p.m. on school days. The policy stated that:
 
 
 5
 Permission for use of school facilities after instructional time ends on school days will be granted to Community Groups: (1) for use of District's athletic facilities, provided that the use is limited exclusively to athletic activities; and (2) for meetings of Scouts (Girl, Boy, Cub, Tiger Cub, and Brownies), provided that such meetings shall be limited exclusively to the scout program and shall not include any speech or activity involving religion or religious beliefs.
 
 
 6
 Dist.Ct.Op., at 6. The exemption for the Scouts was based on the School District's "long-standing tradition of cooperation with scout programs." Id. at 10-11. The Amended Use Policy excluded the Club from meeting at its regularly scheduled time, but allowed the Club access to school facilities after 6 p.m. on school days, and after 8 a.m. on weekends. The Club filed suit in district court, seeking injunctive and declaratory relief based on its First Amendment rights.
 
 
 7
 After a bench trial, the district court returned a judgment in favor of the School District. The district court found that the School District's facilities constituted a non-public forum between 3 and 6 p.m. on school days. The district court also concluded that the long-standing relationship between the Scouts and the School District was a reasonable basis upon which to allow the Scouts to meet between 3 and 6 p.m. on school days and that the school board's concern over the possibility of an Establishment Clause violation was a reasonable consideration for excluding the Club under the Amended Use Policy. Finally, the district court determined that the Amended Use Policy did not discriminate on the basis of viewpoint.[3]
 
 II. DISCUSSION
 
 8
 The Club raises numerous grounds for reversal; we need consider only one: whether the Amended Use Policy results in impermissible viewpoint discrimination as described in Lamb's Chapel v. Center Moriches Union Free School District, --- U.S. ----, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). We hold that the Amended Use Policy results in viewpoint discrimination against the Club that does not serve a compelling governmental interest, and therefore, we reverse.
 
 
 9
 The School District's argument in opposition to the Club's viewpoint discrimination claim is three-fold. First, the School District argues that the Club waived the issue of viewpoint discrimination on appeal because it did not raise it at trial. Second, the School District argues that the district court properly held that its reason for adoption of the Amended Use Policy was reasonable and did not constitute viewpoint discrimination. Finally, the School District argues that if the Amended Use Policy results in viewpoint discrimination, that discrimination serves the compelling governmental interest of not violating the Establishment Clause.
 
 A. Waiver of Viewpoint Discrimination
 
 10
 The School District first argues that the Club never raised the viewpoint discrimination argument; rather, the School District characterizes the Club's argument as limited to a "limited public forum" argument in which the Club and the Scouts were similarly situated. The School District argues that the Club cannot raise this new argument on appeal. We disagree.
 
 
 11
 First, the Club did present the viewpoint discrimination argument to the district court. After the bench trial, in its post-trial brief, the Club reiterated its four theories of recovery. The Club's third theory, based solely on the Free Speech Clause, claimed that the School District
 
 
 12
 acted with unconstitutional motive so as to frustrate or make more difficult the meetings of religious organizations (in particular, the Club). The law does not require that the Defendants' motives have been malicious or hateful to be unconstitutional, only that they intended to cause the meetings of religious groups to be excluded from access between 3 and 6 p.m.
 
 
 13
 Club's Post-Trial Br., Doc. 60, at 2-3. Amicus for the Club added further specificity to the Club's free speech claim by arguing the issue of viewpoint discrimination to the district court. Amicus Br., Doc. 46, at 13 & n. 11 ("Amicus believes that the school district has created a designated forum.... However, we will focus on the protections that the First Amendment affords speech, even in a nonpublic forum."). To be sure, the Club's principal argument stressed that the School District had created a limited public forum, and that the Club and the Scouts were similarly situated. The Club's arguments, however, were not limited to that sole basis. See Club's Post-Trial Br., Doc. 60, at 10 n. 16 (stating that the Club has standing to raise its own rights with respect to viewpoint discrimination); Club's Br. in Support of Preliminary Injunctive Relief, Doc. 12, at 7 ("View-point [sic] discrimination has never been permitted in any of the three fora."). The Club raised the issue that adoption of the Amended Use Policy was based on an unconstitutional motive that violated the Free Speech Clause, i.e., viewpoint discrimination.
 
 
 14
 Second, the School District's defense to the Club's free speech claim was that the Amended Use Policy created a non-public forum, not a limited public forum. An analysis of a governmental policy that limits speech in a non-public forum requires an inquiry into whether the policy is reasonable and viewpoint neutral. See Lamb's Chapel, --- U.S. at ----, 113 S.Ct. at 2147; Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985) (remanding to district court for a determination of whether non-public forum policy was viewpoint neutral); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 49, 103 S.Ct. 948, 957, 74 L.Ed.2d 794 (1983). The School District was aware that the Constitution places restrictions on government exclusion of speech even in a non-public forum. In particular, the School District alerted the district court to the then-current standard in its post-trial brief by stating: " 'Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.' " School Dist.'s Post-Trial Br., Doc. 58, at 17 (quoting Cornelius, 473 U.S. at 807, 105 S.Ct. at 3451-52) (emphasis added). Thus, the School District's defense also put viewpoint discrimination into issue.[4]
 
 
 15
 Finally, the district court recognized that viewpoint discrimination was an issue in this case. Dist.Ct.Op. at 11 (citing Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 959 F.2d 381, 386 (2d Cir.1992), rev'd, --- U.S. ----, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993)).[5] In its memorandum opinion, the district court spent substantial effort determining whether the Amended Use Policy was reasonable and whether it constituted viewpoint discrimination. Id. at 17-18. Thus, the district court recognized that viewpoint discrimination was an issue before it, and the district court decided that issue. Id.; cf. Struempler v. Bowen, 822 F.2d 40, 42 (8th Cir.1987) ("When an issue was actually decided in the trial court, even though not expressly raised by the parties, the rule against consideration of the question on appeal loses a good deal of its force."); Moylan v. Maries County, 792 F.2d 746, 749 (8th Cir.1986) (construing factual allegations in complaint to hold that claim of hostile work environment was before district court).
 
 
 16
 We conclude that (1) the Club raised the issue of viewpoint discrimination, (2) the School District's defense required a determination regarding viewpoint discrimination, and (3) the district court both recognized that viewpoint discrimination was an issue and made determinations on that issue. Therefore, we conclude that the Club has not waived the viewpoint discrimination claim.
 
 B. Viewpoint Discrimination
 
 17
 "Control over access to a non-public forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451 (citing Perry, 460 U.S. at 49, 103 S.Ct. at 957) (emphasis added); see also Lamb's Chapel, --- U.S. at ----, 113 S.Ct. at 2147.[6] We turn to whether the Amended Use Policy results in viewpoint discrimination.
 
 
 18
 The School District argues that the district court properly concluded that adoption of the Amended Use Policy did not constitute viewpoint discrimination. The School District argues the Club failed to demonstrate that "(1) the forum ... include[s] the subject matter of the [Club's] viewpoint; (2) the [Club] ... ha[s] a particular viewpoint regarding the subject matter; and (3) the [School District] oppose[d] that viewpoint." School Dist.'s Br. at 32-33 (footnotes omitted; citing Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451, and Perry, 460 U.S. at 49, 103 S.Ct. at 957). To the extent that these factors reflect current viewpoint discrimination law, we examine them in turn.
 
 
 19
 First, the subject matter for which the Club sought access to the School District facilities already was included in the forum as evidenced by the Scouts' speech. See Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451 ("[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." (emphasis added)). When the district court analyzed whether the Scouts and Club were similarly situated, it determined that
 
 
 20
 [a]lthough both the Club and the Scouting program are concerned with the moral development of youth, the Club is fundamentally a Christian organization, the primary purpose of which is to instill and reinforce Christian faith and values in its members. The Scouts, by contrast, are a secular organization, the primary purpose of which is to develop skills and moral character not related to any religious faith.
 
 
 21
 Dist.Ct.Op. at 21 (emphasis added). The district court also found that "[t]he purpose of Scout meetings is for the young persons involved to have fun, to support the ideals of Scouting, education, and reinforcement of moral values." Id. at 20 (emphases added). The ideals of Scouting are set out in the Scouting handbooks, which the School District provided to the district court, under the heading "Scout Law": "A Scout is TRUSTWORTHY ... A Scout is LOYAL ... A Scout is HELPFUL ... A Scout is FRIENDLY ... A Scout is COURTEOUS ... A Scout is KIND ... A Scout is OBEDIENT ... A Scout is CHEERFUL ... A Scout is THRIFTY ... A Scout is BRAVE ... A Scout is CLEAN ... A Scout is REVERENT." School Dist.'s Ex. PP, at 7-8 (emphasis in original); see also id. at 9 ("The Scout slogan is DO A GOOD TURN DAILY. Good Turns are helpful acts of kindness done quietly, without boasting, and without expecting reward or pay. Doing at least one Good Turn every day is a normal part of a Scout's life."). See generally School Dist.'s Exs. QQ, RR, SS, TT, UU, VV (Scout manuals describing ideals of Scouting).[7] Thus, the "ideals of Scouting," which Scout meetings seek to support, involve exactly the same category of speech for which the Club seeks access: moral and character development.
 
 
 22
 Further, the Amended Use Policy defines the scope of permissible speech from 3 to 6 p.m. by reference to the speech which may occur during the Scout meetings. The Scouts may engage, with the School District's blessing, in any speech relating to moral character and youth development. Id. at 6; cf. Lamb's Chapel, --- U.S. at ----, 113 S.Ct. at 2147. Because both the Club and the Scouts discuss issues relating to moral character and youth development, the subject matter for which the Club seeks access already is included under the Amended Use Policy.[8]
 
 
 23
 Second, the Club has demonstrated that it has a viewpoint, i.e., a religious viewpoint, regarding moral character and youth development. See id. In Lamb's Chapel, the Supreme Court held that denial of access to a religious group to show films regarding child-rearing and family values from a religious perspective constituted impermissible viewpoint discrimination. Id. The Lamb's Chapel Court held that the religious group had demonstrated its particular viewpoint because its proposed First Amendment expression, on otherwise includible subject matter, had a religious perspective. Id. --- U.S. at ---- - ----, 113 S.Ct. at 2147-48. "Viewpoint" is not limited to whether a speaker supports or opposes a particular resolution of an issue; rather, viewpoint is synonymous with perspective. Id. --- U.S. at ----, 113 S.Ct. at 2147 (stating that religious film was excluded because "presentation would have been from a religious perspective"). The Lamb's Chapel Court stated:
 
 
 24
 That all religions and all uses for religious purposes are treated alike under Rule 7, however, does not answer the critical question whether it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child-rearing except those dealing with the subject matter from a religious standpoint.
 
 
 25
 Id.[9] Further, the Lamb's Chapel Court refused to cabin religious speech into a separate excludible speech category; rather, the Court adopted a more expansive view, recognizing that a religious perspective can constitute a separate viewpoint on a wide variety of seemingly secular subject matter. Id. The Club has demonstrated, and the district court found, that the Club has a religious viewpoint on moral issues and youth development. See Dist.Ct.Op. at 20-21 (holding that Scouts and the Club are not similarly situated because the Scouts are secular and the Club is religious). The district court's determination is unquestionably correct.
 
 
 26
 Finally, the School District claims that before this court can hold that the Amended Use Policy resulted in viewpoint discrimination, this court must determine that the School District was hostile or opposed to the Club's viewpoint.[10] The School District cites to statements in Perry and Cornelius to support this argument; Lamb's Chapel requires us to reject it.
 
 
 27
 The Club need not establish that the School District opposed the Club's viewpoint; rather, the Club need only demonstrate that the Amended Use Policy allowed the Scouts to express their viewpoint on moral and character development but prohibited the Club's religious viewpoint. In Lamb's Chapel, the Supreme Court determined that the school access policy constituted impermissible viewpoint discrimination without any determination that the school officials opposed or disagreed with the religious perspective proposed. See --- U.S. at ---- - ----, 113 S.Ct. at 2147-48. The relevant inquiry was whether the Lamb's Chapel group was excluded because of its religious viewpoint, irrespective of whether the school district opposed that viewpoint. Id.
 
 
 28
 In this case, the district court found that "the citizen comments and complaints about the Club were the primary factor leading to the School Board's examination of the 1986 Use Policy and eventual adoption of the Amended Use Policy." Dist.Ct.Op. at 17-18 (emphases added). The only complaints registered against the Club were in reference to the religious content of the Club's meetings. Id. at 17 ("[The Club] presented evidence, as did [the School District], that criticism from some members of the community about the religious nature of the Club was the catalyst for amending the Policy." (emphasis added)).[11] We cannot say that the district court's finding that the primary reason that the School District adopted the Amended Use Policy was to exclude the Club from its premises from 3 to 6 p.m. on school days was clearly erroneous.
 
 
 29
 Even if we were to reject this finding as clearly erroneous, which we do not, the School District's viewpoint discrimination appears on the face of the Amended Use Policy. Specifically, the Amended Use Policy allows the Scouts access to the facilities so long as "such meetings shall be limited exclusively to the scout program and shall not include any speech or activity involving religion or religious beliefs." Id. at 6. Thus, like the utilization policy in Lamb's Chapel, the Amended Use Policy restricts access to the facilities based on religious viewpoint. See --- U.S. at ----, 113 S.Ct. at 2144.[12]
 
 
 30
 Thus, we conclude that the Amended Use Policy results in viewpoint discrimination because it denies the Club access based on the Club's religious perspective on otherwise includible subject matter.
 
 C. Compelling Governmental Interest
 
 31
 The School District argues, in the alternative, that viewpoint discrimination is justified because it serves the compelling governmental interest of avoiding an Establishment Clause violation. School Dist.'s Br. at 41.[13] An abridgment of free speech otherwise protected by the First Amendment must be justified by a compelling governmental interest. Lamb's Chapel, --- U.S. at ----, 113 S.Ct. at 2148. Further, "the interest of the State in avoiding an Establishment Clause violation 'may be [a] compelling' one justifying an abridgment of free speech otherwise protected by the First Amendment." Id. (quoting Widmar v. Vincent, 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981)) (alteration by Lamb's Chapel ).
 
 
 32
 The School District frames the issue as follows: "[T]he Court must determine whether an adult initiated and led community group holding religious meetings in an elementary school from 3:00 to 4:00 p.m. on school days, while elementary students remain at school engaged in school sponsored activities, would be a violation of the Establishment Clause." School Dist.'s Br. at 41. The School District's argument is, in a nutshell, that adoption of the Amended Use Policy was necessary to prevent an establishment of religion resulting from the 1986 Use Policy. Thus, we must determine whether the 1986 Use Policy created an impermissible establishment of religion.
 
 
 33
 Although much maligned, the Lemon test controls this court's analysis of whether governmental activity results in an impermissible establishment of religion.[14] See Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); see also Mergens v. Board of Educ., 867 F.2d 1076, 1079 (8th Cir.1989), aff'd, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 2356 (1990); Chess v. Widmar, 635 F.2d 1310, 1317 (8th Cir.1980), aff'd sub nom. Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). In order to satisfy the Lemon test, a challenged governmental action must (1) have a secular purpose, (2) not have the primary or principal effect of advancing religion,[15] and (3) not foster an excessive entanglement with religion. Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111-12. We examine whether the 1986 Use Policy violates Lemon.
 
 1. Secular Purpose
 
 34
 We first examine whether the 1986 Use Policy had a secular purpose. "The 1986 Use Policy allowed access to any community or student organization upon application for a permit and depending on availability of space." Dist.Ct.Op. at 5. We have little trouble concluding that opening the schools for expressive conduct to community and student groups serves the secular purpose of providing a forum for an exchange of ideas and social intercourse. Thus, the 1986 Use Policy satisfies the secular-purpose prong of Lemon.
 
 2. Primary or Principal Effect
 
 35
 The primary effect of the 1986 Use Policy is not the advancement of religion. See Chess, 635 F.2d at 1317 (holding that open access policy at University would serve secular purpose of developing students' " 'social and cultural awareness' "). Rather, any incidental benefits to religion are secondary to the primary secular effect of providing a neutral forum for the exchange of ideas. The 1986 Use Policy does not "confer any imprimatur of state approval on religious sects or practices," Widmar, 454 U.S. at 274, 102 S.Ct. at 276, because that policy opens the school district facilities to any and all community and student groups. The empirical evidence demonstrates that the Club's uses under the 1986 Use Policy were dwarfed by the non-religious uses of the Scouts and other groups. During the 1991-92 school year the Club met 8 times, the Scouts met 193 times, and athletic activities met 778 times. The Club's meetings comprised 8 of 993 total uses. We cannot say that the School District facilities were so overrun by the Club that the primary effect of the 1986 Use Policy was the advancement of religion.[16]
 
 
 36
 Some of the cases cited by the School District emphasize factors that may inform the primary-purpose prong analysis of the Lemon test. Those factors include (1) the age of the students--from eleven to fifteen years old; (2) the timing of the meetings--immediately after instructional time; and (3) the involvement in the Club by Jane Cunningham, a former school board member.
 
 
 37
 We conclude that the age of the junior high school students does not create an Establishment Clause violation. In Mergens, Justice O'Connor, speaking for a four-Justice plurality, stated that "there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." 496 U.S. at 259-60, 110 S.Ct. at 2372 (plurality opinion); see also id. 496 U.S. at 250, 110 S.Ct. at 2377 (Kennedy, J., concurring) (abandoning Lemon analysis for coercion analysis). Justice O'Connor further explained that secondary school students--in that case, high school students--were mature enough to make this distinction between private speech and public speech because "[t]he proposition that schools do not endorse everything they fail to censor is not complicated." Id. (plurality opinion) (adopting congressional fact-finding in the Equal Access Act that rejected likelihood of confusion by "secondary school" students with respect to difference between public and private speech).
 
 
 38
 The Seventh Circuit in Hedges v. Wauconda, 9 F.3d 1295, 1298-300 (7th Cir.1993), recently extended this analysis to junior high school students. In Wauconda, the school district sought to prohibit junior high school students from passing out religious literature immediately before and after classes. Id. at 1298. The Seventh Circuit rejected the school's argument that the suppression of speech was justified to avoid the appearance of religious sponsorship. Id. at 1298-99. In doing so, the Wauconda court held that students could appreciate the difference between public and private speech because it was not a difficult concept. Id. at 1300 ("If pupils do not comprehend so simple a lesson, then one wonders whether the Wauconda schools can teach anything at all.").[17] We agree with the Seventh Circuit that junior high school students can appreciate the difference between public and private speech, and therefore the 1986 Use Policy did not result in an Establishment Clause violation.[18]
 
 
 39
 Second, the timing of the meetings, immediately after school, does not result in an establishment of religion. The basis behind the timing argument is that state law compels student attendance at school. This argument loses much of its force because the Club meetings are held after instructional hours when student attendance is no longer compelled. See Mergens, 496 U.S. at 250, 110 S.Ct. at 2372; see also Hedges, 9 F.3d at 1298 ("[N]othing in the first amendment postpones the right of religious speech until high school, or draws a line between daylight and evening hours."). Thus, we conclude that the timing of the meetings did not render the 1986 Use Policy unconstitutional.
 
 
 40
 Finally, the School District relies on the fact that a former school board member, Jane Cunningham, was involved with the Club. The School District attempts to analogize Cunningham's involvement with the Club to the involvement of the classroom teacher in Quappe whose actions created a state endorsement of religion. 772 F.Supp. at 1014-15. In Quappe, the teacher "used her classroom as a forum for dissemination of her religious view"; "[s]he used her classroom to recruit members for the Club"; and "[h]er participation in the Club, therefore, created a substantial danger that Club members would view the Club as an officially endorsed extension of the regular school day." Id. at 1014.
 
 
 41
 The circumstances here are distinguishable. Cunningham's position as a former school board member does not create the same problems of " 'the students' emulation of teachers as role models' " perceived in Quappe. Cunningham had no classroom from which to recruit; nor would her appearance after instructional hours create the same danger of an appearance of a continuation of the school day as if she were a teacher present throughout the day. More to the point, Cunningham was no longer involved with the Club when the School District adopted the Amended Use Policy. Cf. id. at 1006 (stating that teacher "has continued to play a significant role in the Club's existence"). Thus, Cunningham's former involvement with the Club does not create the danger of a perception of an establishment of religion.
 
 
 42
 In summary, the primary or principal effect of the 1986 Use Policy was not the advancement of religion; rather, the primary effect was to establish a neutral forum for community and student groups to engage in the exchange of ideas.
 
 
 43
 3. Excessive Governmental Entanglement with Religion
 
 
 44
 Finally, we turn to whether the 1986 Use Policy resulted in excessive entanglement with religion. The 1986 Use Policy results in no entanglement with religion because the School District need not distinguish among groups or monitor the community groups that utilize its facilities. Chess, 635 F.2d at 1317 ("[S]ince [an open-access] policy would make no distinction between groups or their purposes, entanglement with religion would be completely avoided." (internal quotes omitted)). Further, the Club's requirement that students obtain written parental consent before they can attend would dispel any need for a school monitor to determine that attendance was voluntary. Cf. Brandon v. Board of Educ., 635 F.2d 971, 979 (2d Cir.1980), cert. denied, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981).[19]
 
 
 45
 We conclude that the 1986 Use Policy had a secular purpose, did not have the primary effect of advancing religion, and did not result in impermissible entanglement with religion. Thus, the 1986 Use Policy did not result in an establishment of religion.
 
 
 46
 Adoption of the viewpoint discriminatory Amended Use Policy, therefore, did not serve a compelling governmental interest. Therefore, we hold that the Amended Use Policy violates the free speech clause of the First Amendment because it results in impermissible viewpoint discrimination.III. CONCLUSION
 
 
 47
 Accordingly, we reverse the judgment of the district court and remand to the district court for a determination of a remedy consistent with this opinion.
 
 
 48
 BRIGHT, Senior Circuit Judge, dissenting.
 
 
 49
 The constant vigilance of this nation's courts has preserved the religious liberty of all people in the United States by keeping churches and governments from meddling in each other's business and activities. The wall of separation between church and state is not inimical to religion, but has permitted diverse religious beliefs to flourish. The principles embodied in the Establishment Clause of the First Amendment[1] have spared the United States much of the religious strife that has plagued other countries. Although most Americans subscribe to the principle of separation between church and state, history indicates that the majority religion in many communities often seeks to have a public school carry out a religious mission or function compatible with the views of the majority.
 
 
 50
 In this case, the Ladue School Board has adopted a neutral policy toward community groups seeking to conduct their activities at the Junior High School during the school day. Although formal instruction ends at 3 p.m., the Board considers the school day as extending from the morning hours to 6 p.m., when school-sponsored activities end. All community groups, including religious and political groups, have access to school facilities after 6 p.m. on school days and after 8 a.m. on non-school days. The period from 3 p.m. to 6 p.m. remains reserved for school-sponsored activities, community athletic endeavors, and scouting activities, which by tradition and experience relate closely to the secular education at the Ladue Junior High School. The School Board's policy is not an anti-religious one.
 
 
 51
 The plaintiffs in this case--parents who wish to teach and instill Christian religion and values, and student Club members--brought this action asserting the Club's right to meet at the school between 3 p.m. and 4 p.m. The plaintiffs contend that this time slot is more than a matter of convenience for participating students and parents; they urge that the Club will be destroyed if it cannot meet at this hour.[2]
 
 
 52
 In this case, the district court, the Honorable Edward Filippine, Chief Judge, granted the parties a full hearing, made extensive findings of fact, applied the applicable law to his findings and rejected the Club's claims asserting that the School Board unconstitutionally deprived Club members of their rights.[3]
 
 
 53
 The majority opinion in this case, without full analysis of Judge Filippine's opinion, seizes on a single claim made by the plaintiffs that the school policy results in viewpoint discrimination against the Club. That conclusion is reached by ignoring Judge Filippine's careful and detailed findings of fact, misconstruing the factual record made in this case and thereafter attempting to apply the precedent of Lamb's Chapel v. Center Moriches School District, --- U.S. ----, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), to reach its conclusion. Because Lamb's Chapel does not control on the facts of this case, the majority reaches an erroneous result.
 
 
 54
 In my view, the majority's holding--based on misinterpretation of the facts and misapplication of the law--leads to improper judicial interference with the School Board's policies, and represents judicial activism which has no warrant under existing law. I therefore strongly dissent.
 
 I. ANALYSIS
 
 55
 A. District Court's Findings of Fact and Application of Law
 
 
 56
 The majority opinion, I believe, has taken liberties with the district court's findings of fact in arriving at its result. Accordingly, I deem it appropriate and helpful to summarize the findings of the district court and the conclusions flowing therefrom.
 
 
 57
 Initially, the district court found that the Club began in the late 1970s when the children met once a month in the homes of interested adults. In December of 1988 Superintendent Charles McKenna, now a defendant, granted the Club permission to meet once a month at the Junior High School. Under the name "Good News Club", the group met monthly during the 1988-89, 1989-90 and 1990-91 school years.
 
 
 58
 The term "Bible" first appeared on the Club's permit application for the 1991-92 school year, thus clearly denoting the organization as a religious club. Soon after, a conflict arose among parents of school children. At the Board's February 1992 meeting, two parents complained of alleged recruitment of their children by the Club. These complaints prompted the Board to review its prior policy (hereinafter "1986 Policy") governing community group access to school facilities. As part of that review, the Board had its staff attorney research the Establishment Clause issue. The Board also held public hearings where parents aired their views and concerns.
 
 
 59
 Based on its review, the Board adopted its present policy in July, 1992 ("1992 Policy"). The 1992 Policy opened the schools to all community groups after 6 p.m. on school days and after 8 a.m. on other days. This policy closed the schools to all community groups between the hours of 3 p.m. and 6 p.m. on school days, with two exceptions: (1) community athletic groups and (2) Scout groups. The 1992 Policy also contained a proviso excluding all religious speech from the forum between 3 and 6 p.m. When the Board rejected the Club's subsequent application requesting permission to meet at 3 p.m., the Club filed this action seeking prospective injunctive relief.
 
 
 60
 B. Whether the Ladue School Board Created a Limited Public Forum Between 3 p.m. and 6 p.m. on School Days
 
 
 61
 The Club contended in the district court and on appeal that by permitting Scout activities after 3 p.m. on school days, the Board created a limited public forum open to the Club. Relying on Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the trial court rejected plaintiffs' contention that Scouting use of school facilities between 3 p.m. and 6 p.m. justified the Club's application. The district court stated:
 
 
 62
 The reason given by the School Board for allowing access to Scouts immediately after school hours is that the School District has a 'long-standing tradition of cooperation with scout programs....' Defendant's Ex.L. The Court finds this explanation valid and reasonable. This type of selective access to a community group with a long-standing relationship with the School District does not convert the nonpublic forum of public school facilities into a limited public forum. Scouting activities are compatible with the purposes of public education and, especially in light of the School District's long term relationship with the Scouts, the Court finds that limiting access to Scouting groups is reasonable. During the period of 3:00 to 6:00 p.m., the School District facilities are not open 'for indiscriminate use by the general public....' Perry Educ. Ass'n, 460 U.S. at 47 [103 S.Ct. at 956]. The facilities are available only for selective access by Scouts and by those wishing to use the athletic facilities. Under the facts of this case, the Court finds that the Ladue Public School facilities are a nonpublic forum from 3:00 to 6:00 p.m.
 
 
 63
 Good News/Good Sports Club v. School Dist. of the City of Ladue, --- F.Supp. ----, 1993 WL 719555, No. 4:92CV1813, slip op. at 10-11 (E.D.Mo. Mar. 2, 1993).
 
 
 64
 The trial court ruled correctly on this issue and the majority does not overrule that determination. Public schools have never been considered traditional public fora which "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988). Thus, Ladue Junior High School is not a traditional public forum.
 
 
 65
 Nor did the Board "designate" the School as an open forum for speech between 3 and 6 p.m. A school facility may be deemed a public forum only if school authorities by policy or practice open those facilities for general use by the public, or by some segment of the public, such as student organizations. Id. at 267, 108 S.Ct. at 567-68. Here, the Board did not, by policy or practice, open its facilities in this manner. Indeed, the Board adopted its 1992 Policy with the specific intent of closing what may have been a limited public forum under its prior policy. See Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 802, 105 S.Ct. 3439, 3448-49, 87 L.Ed.2d 567 (1985) (court looks to government policy and practice to determine whether it intended to designate a place not traditionally open to free discourse as a public forum).
 
 
 66
 C. Whether the School District Acted to Destroy the Club
 
 
 67
 Plaintiffs asserted in the district court that the School Board acted with the intent to destroy the Club because of its religious activities. The trial court rejected that contention, stating:
 
 
 68
 The Court further finds that no evidence supports plaintiffs' contention that the School Board acted with the intent to destroy the Club because of its religious activities. All of the evidence presented supports the conclusion that the Board heard evidence both pro and con regarding the Club; that all comments were seriously considered by the Board members; and that the Board members sought legal advice from their attorney as how best to meet the needs of the community without risking a constitutional violation. The Court finds no credible evidence to support a finding that the School Board acted with an unconstitutionally discriminatory motive in amending the Use Policy.
 
 
 69
 --- F.Supp. at ---- (Dist.Ct.Op. at 19). This contention has been abandoned on this appeal.
 
 
 70
 D. Whether the Board's Policy Amounts to Viewpoint Discrimination
 
 
 71
 Upon determining that the 1992 Policy did not create a limited public forum, the district court analyzed the facts and law in determining that the Board did not violate the free speech rights of the students or adults in the Club. The court observed that the Board's reasons for adopting a new access policy need only meet a standard of reasonableness:
 
 
 72
 Because the Court finds that the Amended Use Policy does not create a limited public forum, but that the School District facilities are a nonpublic forum from 3:00 to 6:00 p.m., the restriction on plaintiffs' access immediately after instructional time must only meet the standard of reasonableness. The reasonableness standard is met 'when the applicable restrictions "reflect a legitimate government concern and do not suppress expression merely because public officials oppose the speaker's view." ' Lamb's Chapel, 959 F.2d at 386 (quoting Paulsen v. County of Nassau, 925 F.2d 65, 69 (2d Cir.1991)). Furthermore, 'the restriction "need only be reasonable; it need not be the most reasonable or the only reasonable limitation." ' International Soc'y for Krishna Consciousness v. Lee, --- U.S. ----, ----, 112 S.Ct. 2701, 2708 [120 L.Ed.2d 541] (1992) (emphasis in original) (quoting United States v. Kokinda, 497 U.S. 720, 736 [110 S.Ct. 3115, 3124-25, 111 L.Ed.2d 571] (1990) (plurality opinion)).
 
 
 73
 If the justifications given are facially reasonable, the Court must then determine whether the proffered reasons are mere pretext for viewpoint discrimination. Cornelius, 473 U.S. at 797 [103 S.Ct. at 3446]. Although the government may restrict access to a non-public forum based on the subject matter of speech, the Court must determine whether the restriction 'conceal[s] a bias against the viewpoint advanced by the excluded speakers.' Id., 473 U.S. at 812 [103 S.Ct. at 3454].
 
 
 74
 --- F.Supp. at ---- (Dist.Ct.Op. at 11-12).
 
 
 75
 1. Fear of an establishment clause violation
 
 
 76
 The trial court then examined and made findings relating to the Board's policy as follows:
 
 
 77
 One reason provided by the School District for amending the 1986 Use Policy is that the type of access allowed under the 1986 policy might[4] violate the Establishment Clause of the First Amendment. Plaintiffs contend that the 1986 Policy did not violate the Establishment Clause. The question whether or not the 1986 Policy violated the Establishment Clause, however, is not before this Court; this Court must determine only whether defendants' concern over a possible constitutional violation, resulting in closing the limited public forum from 3:00 to 6:00 p.m., was a true reason and a reasonable justification for amending the 1986 Use Policy.
 
 
 78
 In a recent case involving a claim of violation of the Establishment Clause, the Supreme Court held:
 
 
 79
 The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause. It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which "establishes a [state] religion or religious faith, or tends to do so." Lynch v. Donnelly, 465 U.S. 668, 678, [104 S.Ct. 1355, 1361-62, 79 L.Ed.2d 604] (1984).
 
 
 80
 Lee v. Weisman, --- U.S. ----, ----, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992).
 
 
 81
 In a number of cases, United States Courts have found Establishment Clause violations where access to school district facilities by religious groups was allowed. In Bell v. Little Axe Indep. School Dist. No. 76, 766 F.2d 1391 (10th Cir.1985), the court recognized 'the special concern for religious neutrality in the public school setting[.]' Id. at 1402. The court held that the school violated the Establishment Clause when it allowed religiously-oriented student meetings in the school before classes began. Id. at 1407. In Lubbock Civil Liberties Union v. Lubbock Indep. School Dist., 669 F.2d 1038 (5th Cir.), reh'g denied, 680 F.2d 424 (1982), cert. denied, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983), the court found an Establishment Clause violation where a school district policy permitted students to gather either before or after school hours for Bible readings and other religious activity.
 
 
 82
 In a case with facts similar to the instant case, a district court found that permitting a Bible study club to meet immediately after classes would have violated the Establishment Clause. Quappe v. Endry, 772 F.Supp. 1004 (S.D.OH 1991), aff'd, 979 F.2d 851 (6th Cir.1992). Although the facts of these and other cases may be distinguishable from the facts in the instant case, this does not diminish the reasonableness of defendants' concern regarding a possible Establishment Clause violation under the 1986 Use Policy. The credible evidence at trial was that the School Board had received complaints from some parents and citizens within the School District regarding meetings of the Club directly after school. At least one parent complained that her child had been approached and solicited by another student to attend meetings of the Club.
 
 
 83
 Plaintiffs contend that the fear of an Establishment Clause violation was not reasonable and was not a valid consideration when the School Board amended the Use Policy to restrict plaintiffs' after school access. The United States Court of Appeals for the Eighth Circuit, however, has found that concern regarding an Establishment Clause violation is a 'reasonable justification' for placing restrictions on access to school facilities for religious groups. Salinas v. School Dist. of Kansas City, 751 F.2d 288, 290 (8th Cir.1984). Under the circumstances of this case, and in light of relevant Establishment Clause case law, the Court finds that defendants' concern was reasonable.
 
 
 84
 --- F.Supp. at ---- - ---- (Dist.Ct.Op. at 12-14). The cases cited by the district court support adequately its conclusion of reasonableness, particularly since no caselaw clearly supports a conclusion contrary to that reached by the Board.
 
 
 85
 Further proof of the reasonableness of the Ladue School District's Establishment Clause fears is demonstrated by a review of federal court cases. Our research discloses that no federal court has held that a parent-led religious youth group possesses the constitutional right discovered by the majority today. That is, no court to date has determined that a parent-sponsored religious club has a constitutional right to meet on school property before school children have had the opportunity to depart school premises following mandatory instruction, merely because Scout and community athletic groups are permitted to do so. The Supreme Court's school prayer cases, see, e.g., School District of Abington Tp., PA. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (requiring students to recite Bible verses and the Lord's prayer at opening of school day violated Establishment Clause), along with Perry and Cornelius, all suggest that the Board's concerns were reasonable, and their actions rational. See also Berger v. Rensselaer Cent. Sch. Corp., 982 F.2d 1160, 1167 (7th Cir.1993) (Establishment Clause violated by permitting Gideons to distribute Bibles to public school students during the school day).
 
 
 86
 We have examined cases upholding the equal access rights of student-initiated religious groups on college and high school campuses. See, e.g., Board of Educ., Westside Community Sch. v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (student-sponsored high school religious group entitled under Equal Access Act to use school facilities immediately after classes end); Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (student religious group entitled to equal access to facilities of state university). These cases do not apply to adult-initiated groups seeking access to an elementary school forum, here consisting of the sixth, seventh and eighth grades.
 
 
 87
 Importantly, with respect to a nonpublic forum, the government does not have to select the best or only method of accomplishing its mission of avoiding the appearance of improper endorsement. International Society for Krishna Consciousness v. Lee, --- U.S. ----, ----, 112 S.Ct. 2701, 2708, 120 L.Ed.2d 541 (1992) ("the restriction 'needed only be reasonable; it need not be the most reasonable or the only reasonable limitation.' ") (quoting United States v. Kokinda, 497 U.S. 720, 736, 110 S.Ct. 3115, 3124, 111 L.Ed.2d 571 (1990) (plurality opinion)).
 
 
 88
 I also comment briefly on the concern of parents who do not want their children to participate in the Club or to be recruited for Club activities. The parental notice, Exhibit 4, would indicate children of other creeds, denominations or religions could be subject to peer pressure to join this religious club, all to the discomfort of parents who might profess other beliefs. The parental notice states, in part:
 
 
 89
 Our purpose is to provide any willing and informed student ages 11 to 15 an opportunity to experience Christian fellowship with other students and to allow any student who desires, and has parental consent, no matter what race, creed, denomination, or sex to examine the values taught by Christianity.
 
 
 90
 Parental Notice and Consent Form, Appellant's Add. at E-1.
 
 
 91
 A handout given to all students provides a further example of the Club's peer pressure approach to children of non-Christians or to children of denominations whose parents strictly observe only their own religious practices. The pamphlet in part reads:We're excited to welcome you back to another year of fun at the GOOD NEWS CLUB, a once-a-month gathering of 6th, 7th, and 8th graders from Ladue Junior High.
 
 
 92
 ....
 
 
 93
 The theme for this year is FRIENDSHIP and will include the topics of becoming friends with God, choosing friends, being friends, when opposites attract, being friends with our parents, and friends forever.
 
 
 94
 The goal of the Good News Club is to develop a positive peer group among students so that if/when the drug and other tough dilemmas come just around the corner, it will be easier for kids to stand together for what is right with a common foundation of Biblical principles and a personal relationship with God, rather than trying to stand alone. Our approach is nondenominational.
 
 
 95
 Appellant's Add. at C-1.
 
 
 96
 This sort of pressure or inducement, perhaps subtle proselytizing, directed to sixth, seventh or eighth graders should be a matter of concern to and enter into a policy decision by the School Board. See Lee v. Weisman, --- U.S. ----, ---- 112 S.Ct. 2649, 2658, 120 L.Ed.2d 467 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.").
 
 
 97
 2. Avoiding Controversy and Strife in the Junior High School
 
 
 98
 The School Board offered a second reason for the adoption of the 1992 Policy. The district court stated:
 
 
 99
 Defendants also assert they were concerned that a number of religious groups, hate groups, and/or other controversial groups might seek access immediately after school hours under the 1986 Use Policy. The record does not reflect that any such group had sought access under the 1986 Policy. It is proper, however, for a state to consider the possible large number of groups which might seek access to state facilities. Heffron [v. International Society for Krishna Consciousness, Inc.,] 452 U.S. at 653 [101 S.Ct. 2559, 2566, 69 L.Ed.2d 298 (1981) ]. In Heffron, the International Society for Krishna Consciousness ("ISKCON") challenged a Minnesota state regulation restricting solicitation at the state fair to designated booths. ISKCON contended that this restriction infringed its First Amendment right to proselytize and raise funds for its religious organization. In upholding the state regulation, the Supreme Court recognized that it was proper for the state to consider the possibility that all other groups at the state fair might also seek to solicit from the general public by walking through the fairgrounds although no evidence was presented that any other such group had asserted the right. Id.
 
 
 100
 The Court finds that it was reasonable for defendants to consider the possibility that a large number of religious, political, or philosophical groups might seek access to school facilities while students were still present for school-related after school activities. Even though no evidence was presented that hate groups or other controversial groups planned to seek access under the 1986 Use Policy, 'the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum.' Cornelius, 473 U.S. at 810 [105 S.Ct. at 3453].
 
 
 101
 --- F.Supp. at ---- - ---- (Dist.Ct.Op. at 14-15).
 
 
 102
 These are valid reasons presented by the Board for its present policy. While the Board had not received a request for access from any "hate" group, it concluded reasonably that permitting the Club to use the Junior High School immediately after the school day would open the door to all parent-sponsored religious groups for children, including those whose speech most people would consider morally bankrupt.[5] This concern does not relate to an idle threat. The Supreme Court recently emphasized the obligation of government to act neutrally toward religious choices, calling it a principle "at the heart of the Establishment Clause, that government should not prefer one religion to another, or religion to irreligion." Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, --- U.S. ----, ----, 114 S.Ct. 2481, 2491, 129 L.Ed.2d 546 (1994). The Board acted reasonably to prevent school facilities from turning into a religious battleground for parents and youngsters during the noninstructional part of the school day.
 
 
 103
 II. WHETHER THE CLUB AND THE SCOUTS ARE SO SIMILAR THAT VIEWPOINT DISCRIMINATION EXISTS BECAUSE SCOUTING IS PERMITTED ON SCHOOL PREMISES FROM 3 TO 6 P.M.
 
 
 104
 That both the Club and the Scouts may be concerned with moral development does not make their activities necessarily similar. Moral development is often in the eye of the beholder. Groups espousing radically different ideologies, such as pro-life and pro-choice advocates, both lay claim to moral authority and righteousness. Proponents as well as opponents of sex education in the public schools make similar claims of concern for the moral development of children. Many other examples exist of both sides to controversial issues making claim to high moral grounds supporting diametrically opposed conclusions.
 
 
 105
 Here, the majority seizes upon an isolated sentence from the district court opinion regarding moral development to draw a conclusion that "[b]ecause both the Club and the Scouts discuss issues relating to moral character and youth development, the subject matter for which the Club seeks access already is included under the Amended Use Policy [1992 Policy]." Ante, at 1506.
 
 
 106
 However, the following is the complete factual analysis by the district court supporting its determination that Scouting activities are distinctly different from the Club's activities:
 
 
 107
 The evidence presented at trial supports a finding that the Scouts are primarily a secular organization engaging in secular activities. The purpose of Scout meetings is for the young persons involved to have fun, to support the ideals of Scouting, education, and reinforcement of moral values. Although Scouts may earn religion badges, those badges are earned at home or in the scout's place of worship.
 
 
 108
 Scouting activities include camping, woodworking, swimming, non-religious games, and other secular, skill-oriented activity. Other than the single reference to God in the Scout oath, all activity at Scout meetings is of a secular nature. A review of the Scout manuals introduced into evidence reveals limited reference to God, to the 'Great Master' or to reverence. The great majority of the manuals is devoted to describing different Scouting activities and skills as well as how to earn merit badges. The descriptions of the purpose of Scouting do not include any reference to God or to religion.
 
 
 109
 The Club, by contrast, was initiated to teach the young members Christian values. Each parent who testified at trial testified to the importance of the religious aspect of the Club and that a purpose of the Club was to pass along Christian faith and morality to the student members of the Club. A typical Club meeting consists of an opening prayer, snack, activity, Bible lesson, and closing prayer. Plaintiff Chris Hirt testified in his deposition that he liked the Club because it gave him an opportunity to relate to Christian friends and that it was important to keep the Club going so that others might become Christian. Deposition of Chris Hirt, taken October 27, 1992, at 18.[6]
 
 
 110
 Although both the Club and the Scouting program are concerned with the moral development of youth, the Club is fundamentally a Christian organization, the primary purpose of which is to instill and reinforce Christian faith and values in its members. The Scouts, by contrast, are a secular organization, the primary purpose of which is to develop skills and moral character not related to any religious faith. Any incidental reference to God or the 'Great Master' does not convert the secular nature of the Scouts into a religious nature. Lamb's Chapel, 959 F.2d at 388. The Court, therefore, finds that the Club and the Scouts are not of similar character. Accordingly, even were the Court to find that a limited public forum was created from 3:00 to 6:00 p.m., the Club could not claim a right to access to the School District facilities during that time.
 
 
 111
 --- F.Supp. at ---- - ---- (Dist.Ct.Op. at 20-21) (emphasis added).
 
 
 112
 The majority does not fault the district court's finding, which, upon careful review of the record, is unquestionably correct. Scouting is a secular, skills-oriented activity analogous to and supplementary to learning which takes place in the public school classroom. The Club is a sectarian, worship-oriented activity which seems more analogous to a church-operated Sunday school for junior high youngsters.
 
 
 113
 Finally, Lamb's Chapel, upon which the majority places primary reliance, is distinguishable from this case in several crucial respects, undermining the majority's analysis. In Lamb's Chapel, an adult Church group sought access to a local public high school at night to present a film series on the subject of parenting and family values; the series approached this subject from a religious perspective.
 
 
 114
 The Center Moriches School District's policy permitted community access to its schools for "social, civic, or recreational uses" and "use by political organizations." The Center Moriches policy also provided that school premises could not be used by any group for religious purposes. The Supreme Court determined that exhibiting a film on the subject of parenting and family values could not be excluded from the forum because the subject matter had not been placed off limits by the school district. The Court noted the similarities between other programs permitted at the forum at that hour and the Church's film series, and held that these programs demonstrated that the "subject matter" had been included in the forum: "The film involved here no doubt dealt with a subject otherwise permissible under [the policy], and its exhibition was denied solely because the film dealt with the subject from a religious standpoint." Lamb's Chapel, --- U.S. at ----, 113 S.Ct. at 2141.
 
 
 115
 The same cannot be said for the Club's efforts to bring its program within the Ladue School District's 1992 Policy. The only "subjects" permitted were those "expressed" through athletics and Scouting activities. Neither athletic activities nor Scout meetings included "speech" on the subject of moral development as an integral part of their programs. The possible effect of Scout activities on a child's character (e.g., moral development) does not transform those activities into "speech" on the subject matter of the "moral development of youth." Unlike the subject matter presented by the Lamb's Chapel group, the entire subject matter of the Club's speech activities had been excluded from the school premises at the relevant time.
 
 
 116
 Further, Lamb's Chapel presented none of the special concerns involved in the Ladue School District's decision to adopt its 1992 Policy. The Ladue policy concerns (1) youths of an impressionable age; and (2) use of school facilities immediately after government-mandated attendance ends, while some children are attempting to leave school premises, and during the time in which other children are engaged in school-sponsored activities. Because the Lamb's Chapel group sought to use the local high school to show a film series for adults at night, when no school children were present for school-sponsored activities, its film series did not place young children in the position of having to determine whether the state endorsed the views expressed in the program.[7]
 
 
 117
 Because its factual context differs so greatly from that presented here, Lamb's Chapel does not control the outcome of this case. The 1992 Policy does not discriminate on the basis of viewpoint.
 
 III. SUMMARY AND CONCLUSION
 
 118
 The Ladue School Board, as is the case with school boards generally, is called upon to make difficult policy decisions. In this case, the use of school facilities by the Club produced problems for some parents. The Board gave contending persons a full hearing and received legal advice in this sensitive area of school-religion relationships. The Board thereafter adopted a policy which in essence said to members of the Club (and all other adult-led religious groups), you may meet on school premises after 6 p.m. on school days. The Club, deprived of its more convenient location (and more captive audience) between 3 and 4 p.m., objected and brought this action.
 
 
 119
 In my view, the majority has wrongly ruled that the Board must allow the Club to use the facilities of the school between 3 and 4 p.m. Under the majority's holding, the Board must permit access at 3 p.m. to any group claiming to further the moral development of youth, regardless of that group's irrational or fanatical underpinnings, see supra at 1514 n. 4. And who is likely to suffer? The students, the Scouts, perhaps community athletic groups, for the only way to assuredly sidestep the controversial issues here is to bar all community activities from the forum between 3 and 6 p.m. The Club, however, is not harmed by the Board's action. It may meet, as it has in the past, at another location, or it may choose to meet after 6 p.m. at the school.
 
 
 120
 This court's interference with the School Board's essentially neutral policy regulating community group access during the school day is, in my view, the wrong kind of judicial intervention in the Ladue School District's business. The district court, in a logical opinion supported by ample legal authority, agreed with the Board's right to adopt the 1992 Policy. I agree emphatically with the district court's disposition of this matter rejecting the constitutional challenge to the school policy by the Good News Club.
 
 
 
 *
 McMillian, Circuit Judge, would grant the suggestion for rehearing en banc
 
 
 [1]
 For convenience, we will refer to the Club, its members, and the parents of its members as "the Club."
 
 
 [2]
 The Scouts include: Girl Scouts, Boy Scouts, Cub Scouts, Tiger Cub Scouts, and Brownies. Good News/Good Sports Club v. School Dist., No. 92-CV1813, slip op. at 6, 1993 WL 719555 (E.D.Mo. Mar. 2, 1993) (hereinafter, "Dist.Ct.Op.")
 
 
 [3]
 Because we need not analyze the Club's religion clause claims, we express no opinion as to the district court's resolution of those claims
 
 
 [4]
 The School District proffered evidence to establish that it had satisfied the reasonableness prong of the non-public forum analysis. School Dist.'s Br. at 41-42 n. 30 ("[The School District], nevertheless, briefed [the Establishment Clause issue] below to show that their concerns were reasonable and the Court so found." (emphasis added))
 
 
 [5]
 The district court relied, and the dissent now relies, in part, on the Second Circuit's legal analysis in Lamb's Chapel, 959 F.2d 381 (2d Cir.1992), rev'd, --- U.S. ----, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). The district court, however, did not have the benefit of the Supreme Court's decision that reversed the Second Circuit and rejected its legal analysis
 
 
 [6]
 We assume, without deciding, that the district court properly found that (1) the Amended Use Policy did not create a limited public forum from 3 to 6 p.m. on school days, and (2) the Amended Use Policy's favoritism to the Scouts based on the Scouts' long-standing relationship with the School District is reasonable. But see R.A.V. v. City of St. Paul, --- U.S. ----, ----, 112 S.Ct. 2538, 2545, 120 L.Ed.2d 305 (1992) ("[G]overnment may not regulate use based on hostility--or favoritism--towards the underlying message expressed.")
 
 
 [7]
 Thus, the dissent's contention that "Scout meetings [did not] include[ ] 'speech' on the subject of moral development as an integral part of their programs," post, at 1518, fails because of the same factual findings that the dissent characterizes as "unquestionably correct," id. at 1518. Like the Club, the Scouts use their meetings as a forum for the purpose of developing moral and character development through skits, songs, and activities. The only difference is that the Club employs a religious perspective
 
 
 [8]
 To the extent that the School District argues that the subject matter of the Club's speech is not already included in the forum because religious speech is a separate speech category, the Supreme Court already has rejected that argument. Cf. Lamb's Chapel, --- U.S. at ----, 113 S.Ct. at 2147 (stating that lecture or film about child-rearing and family values from religious perspective was not "subject matter ... that the District has placed off limits to any and all speakers," when other speakers could discuss same topics from non-religious perspective)
 
 
 [9]
 The dissent seeks to create an additional requirement for establishing that a policy is viewpoint discriminatory; namely, the group challenging the policy must be similar to groups already allowed into the forum. Post, at 1517-18. This inquiry is both misleading and irrelevant. The Lamb's Chapel Court conducted no inquiry into whether the Lamb's Chapel group was similar to groups already within the forum when it determined that the Center Moriches school district had discriminated against the Lamb's Chapel group based on religious viewpoint. --- U.S. at ---- - ----, 113 S.Ct. at 2146-47. The relevant inquiry on this point is whether the Club seeks access to the forum to express a point of view on subject matter already includible in the forum. See id. ("That subject matter is not one that the School District has placed off limits to any and all speakers."). The Club seeks to express ideals on moral and character development already included in the forum by the Scouts
 
 
 [10]
 The dissent argues that there is no evidence that the School District sought to "destroy" the Club. The Club never argued that the School District acted to destroy the Club, Club's Br. at 15 n. 15; thus, far from abandoning this claim on appeal, the Club never raised it
 
 
 [11]
 The School District's defense in this case was that allowing the Club to continue to meet between 3 and 6 p.m. on school days would result in an Establishment Clause violation. Dist.Ct.Op. at 12, --- F.Supp. at ----
 
 
 [12]
 Amici for the School District argue that the breadth of the excluded speech belies the Club's viewpoint discrimination claim. The Amended Use Policy excludes only one viewpoint expressly: the religious viewpoint. Thus, the Scouts can approach moral character and youth development from any perspective they wish except one: a religious perspective. Like Lamb's Chapel, the only perspective expressly excluded is the religious perspective
 
 
 [13]
 The dissent erroneously argues that this section of the majority opinion involves resolution of a "non-issue." Post, at 1514 n. 4. Because we have determined that the Amended Use Policy is viewpoint discriminatory, the School District only can justify that discrimination if it serves a compelling government interest. This section analyzes whether adoption of the Amended Use Policy by the School District served the compelling governmental interest of avoiding an Establishment Clause violation
 
 
 [14]
 Our task is made more difficult because neither the School District nor any of its amici has cited Lemon or applied the Lemon test to the establishment of religion issue
 
 
 [15]
 Justice O'Connor has adopted an approach that refines the effect prong of Lemon to determine whether the governmental action has endorsed religion. Lynch v. Donnelly, 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring) ("The effect prong asks whether, irrespective of the government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval."). A majority of the Supreme Court has not yet adopted Justice O'Connor's endorsement test
 
 
 [16]
 To the extent that the Club receives a benefit because its members can utilize the school late bus, this benefit does not violate the Establishment Clause. See Everson v. Board of Educ., 330 U.S. 1, 18, 67 S.Ct. 504, 512-13, 91 L.Ed. 711 (1947) (upholding a state statute that reimbursed parents of parochial school students for bus transportation expenses)
 
 
 [17]
 Students are not permitted to attend Club meetings until their parents complete a parental consent form. Club's Br. at Add. E-1 ("Parental Notice and Consent Form"). In addition, announcements for the Club stated that the Club was not sponsored by the School District. Id. at Add. C-1 ("The Club is not a Ladue School sponsored activity.")
 
 
 [18]
 Quappe v. Endry, 772 F.Supp. 1004, 1011-12 (S.D.Ohio 1991), aff'd mem., 979 F.2d 851 (6th Cir.1992), does not compel a different result. In Quappe, the district court determined that grade school children from 5 to 10 years old would not be able to distinguish between government and private speech. Id. The students at issue here are 11 to 15 years old. We disagree, however, with the Quappe court that one needs "Solomonic wisdom" to distinguish between private and public speech
 
 
 [19]
 Ironically, the Amended Use Policy adopted by the School District creates substantial entanglement problems. To enforce its no-religion proviso, the School District first must determine what speech constitutes religious speech, and then needs to monitor Scout meetings to ensure compliance with the religion proviso. See Chess, 635 F.2d at 1318. Thus, the Amended Use Policy adopted by the School District creates more pressing establishment problems than the 1986 Use Policy it replaced. See Widmar, 454 U.S. at 272 n. 11, 102 S.Ct. at 276 n. 11 (citing Chess v. Widmar, 635 F.2d at 1318); see also Mergens, 496 U.S. at 246-47, 110 S.Ct. at 2370 (plurality opinion) (stating that open use policy would "avoid entanglement with religion")
 
 
 [1]
 The Establishment Clause states: "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I
 
 
 [2]
 Nothing in the record supports the Club's contention that it would be destroyed if denied its preferred meeting time. Club parents favor the 3-4 p.m. time period primarily because student members can go directly to Club meetings after classes end, and still catch the 3:55 p.m. late bus home. The Club's assertion that it would suffer significant harm under the 1992 Policy is undercut, however, by the undisputed fact that students can take the 3 p.m. school bus anywhere, including to a Club leader's residence for a meeting. The only inconvenience to parents would relate to transportation of children from a meeting place to students' homes
 
 
 [3]
 Good News/Good Sports Club v. School Dist. of the City of Ladue, --- F.Supp. ----, 1993 WL 719555 No. 4:92CV1813, slip op. at 10-11 (E.D.Mo. Mar. 2, 1993)
 
 
 [4]
 The majority spends seven pages, see ante, at 1507-11, attempting to resolve the non-issue of whether the 1986 Policy violated the Establishment Clause. The 1986 Policy has been abandoned. Whether that policy actually violated the Establishment Clause has not been ruled upon by the district court. The district court examined only the reasonableness of the concern that the policy might violate that clause
 
 
 [5]
 Hate speech is frequently cloaked in the garb of religion. Individuals associated with groups such as the KKK, Aryan Nation, and Nation of Islam have asserted religious underpinnings for their racist views. In Wiggins v. Sargent, 753 F.2d 663 (8th Cir.1985), prisoners belonging to the Church of Jesus Christ Christian (CJCC) claimed deprivation of free exercise rights. We held that groups such as the CJCC and Sword of Christ Good News Ministries, both of which "advocate racial purity and believe that race mixing is a sin which is contrary to Biblical teachings," id. at 665, are arguably "religious" entities for first amendment purposes. We also noted that other belief systems, including that held by the Black Muslims, espouse racial separation or superiority. Id. at 667 n. 6. See also McCabe v. Arave, 626 F.Supp. 1199 (D.Idaho 1986) (Church of Jesus Christ Christian, the religious "alter ego" of the Aryan Nation, teaches that white Anglo-Saxons are to be kept separate from all other "mongrel" races, and that race war is inevitable); Brown v. Dade Christian Schs., 556 F.2d 310 (5th Cir.1977) (en banc) (Goldberg, J., concurring) (finding substantial evidence that private school based its whites-only policy on Christian beliefs of school administrators); Invisible Empire, KKK v. Mayor of Thurmont, 700 F.Supp. 281 (D.Md.1988) (noting KKK's position that permitting blacks to march with KKK would be hypocrisy because the KKK supports segregation on religious grounds); Lee v. Crouse, 284 F.Supp. 541 (D.Kan.1967) (Black Muslim sect which espoused separationism and belief in ultimate holy war with whites, is derived from Islamic teachings and should be considered a religion)
 In a recent speech given at Kean College in New Jersey, Khalid Abdul Muhammed, the Nation of Islam's former national spokesman, vilified Jews, Roman Catholics, homosexuals, whites in general, and some blacks. New Jersey Law Journal, Jan. 24, 1994, at 17. Specifically, Muhammed labeled Jews "bloodsuckers of the black nation". Id.
 
 
 [6]
 Chris Hirt's deposition reflects his belief that proselytization is one of the Club's functions
 
 
 [7]
 The majority adopts the somewhat theoretical view that to avoid unconstitutional endorsement, schools must simply state to their students that the school does not endorse all that it permits: "If pupils do not comprehend so simple a lesson, then one wonders whether the [ ] schools can teach anything at all." Ante, at 1509 (quoting Hedges v. Wauconda, 9 F.3d 1295, 1300 (7th Cir.1993)). This statement neglects two important facts: first, with many of our public schools struggling to teach basic literacy and math skills, it is hard to imagine schools devoting much time to explicating the psychology of governmental endorsement; second, the "lesson" to be taught is far from simple, as reflected in our current jurisprudence of fine, sometimes imperceptible, Establishment Clause distinctions. Compare County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (creche placed on Grand Staircase of Allegheny County Courthouse with sign reading "Glory to God in the highest" violated Establishment Clause, but display outside City-County Building featuring menorah, Christmas tree and sign saluting liberty did not) with Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (creche as part of larger Christmas display in City park did not violate Establishment Clause). Also compare Lee v. Weisman, supra (Establishment Clause forbids school district from having clergy member offer prayer as part of public school graduation ceremony) with Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (Establishment Clause does not forbid opening state legislative session by having clergyman lead a prayer)
 Moreover, given the somewhat proselytizing message passed out to these young students, actions may speak louder than words to the students who may see an endorsement of religious views where none is intended by the Board.