FAIRFAX COVENANT CHURCH,
Plaintiff–Appellant,

v.

The FAIRFAX COUNTY SCHOOL
BOARD, Defendant–Appellee.

FAIRFAX COVENANT CHURCH,
Plaintiff–Appellee,

v.

The FAIRFAX COUNTY SCHOOL
BOARD, Defendant–Appellant.

Nos. 93–1334, 93–1382.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 9, 1993.

Decided Feb. 28, 1994.

**ARGUED:** Jordan Woodard Lorence, Paeonian Springs, Virginia, for Appellant.

Thomas John Cawley, Hunton & Williams, Fairfax, Virginia, for Appellee.

**ON BRIEF:** Jane E. Hadro, Paeonian Springs, Virginia, for Appellant.

Stuart A. Raphael, Kimberly A. Newman, Hunton & Williams, Fairfax, Virginia, for Appellee.

Before ERVIN, Chief Judge, and WILKINS and NIEMEYER, Circuit Judges.

## OPINION

NIEMEYER, Circuit Judge:

This appeal presents the issue of whether Fairfax County School Board's Regulation 8420, which establishes rental rates for off-hour use of the county's schools, violates the First Amendment of the United States Constitution by discriminating against churches. Although the Fairfax County School Board makes the county's 172 schools generally available to community and cultural organizations for use after school hours, Regulation 8420 singles out churches for a progressively escalating rental rate to encourage them to rent elsewhere, out of a concern that any long-term church use of school property might constitute an establishment of religion in violation of the First Amendment.

The district court entered summary judgment, holding that Regulation 8420 violates the First Amendment rights of Fairfax Covenant Church, which paid the discriminatory rates, by abridging its freedom of speech and by prohibiting its free exercise of religion 811 F.Supp. 1137. The court, however, refused to impose its ruling retroactively to enable the Church to collect the "overcharges" already paid under the discriminatory rate structure. Fairfax Covenant Church has appealed the district court's refusal to apply its ruling retroactively, and the Fairfax County School Board has cross-appealed the district court's ruling that its regulation is unconstitutional. For the reasons that follow, we affirm the district court's finding that Regulation 8420 violates the Church's First Amendment rights, but we reverse the ruling which denies the Church the right to seek reimbursement for overcharges.

I

The Fairfax County School Board ("the School Board") operates 172 schools in Fairfax County, Virginia, with an annual operating budget of over $850 million. The School Board has opened its facilities to a wide array of private, community, religious and cultural organizations, both commercial and nonprofit, for use after school hours and during weekends under a rental structure adopted in Regulation 8420.

Under Regulation 8420, county, city, or town agencies, county employee and student organizations, and the Boy Scouts and Girl Scouts of America, all "determined to be for the primary benefit of the school or the community," pay no rent for using school facilities. Cultural and civic groups, educational groups, and state and federal governmental groups pay a noncommercial rate designed to reimburse the county for the actual costs for the use of the facilities. Private organizations pay a commercial rate

which is five times the noncommercial rate and is intended to approximate market rental rates. For churches, Regulation 8420 establishes a special escalating rate which allows the church to pay the noncommercial rate for the first five years but, thereafter, requires the church to pay a rate which escalates to the commercial rate over the next four years. The regulation provides specifically:

## II. CONDITIONS OF USE

### G. Churches

Churches/religious organizations servicing Fairfax County citizens may be granted use of a school for as many as five years.... Church/religious groups may be authorized usage after five years of use at increasing rental rates until the full commercial rates become effective in the ninth year of use. Only one church may have a contract for continuing use of a single school during any school year.

Regulation 8420 establishes priority of uses, assigning highest priority to school-related programs. It provides, "When space is available at times that do not interfere with the previously stated priorities, school facilities may be scheduled for use by others, such as [cultural, civic, educational, religious and private groups]." Finally, the Regulation reserves to the School Board the right to deny or cancel uses. The Regulation provides no limit to the number of times a user may rent or use the School Board's facilities, and evidence in the record demonstrates that some organizations have been meeting regularly in School Board facilities for over 20 years. Indeed, the Boy Scouts of America have been meeting in School Board facilities for some 80 years.

The School Board freely acknowledges that it has singled out churches for the escalating rental rate structure to encourage them to go elsewhere, out of a concern for violating the Establishment Clause of the U.S. Constitution. Homer E. Rhoads, the person responsible for administering the rental of the School Board's facilities and for "devising the current Regulation 8420," stated in his affidavit filed in the district court:

[W]e determined that churches should not be permitted to use the schools indefinitely at a rental rate that was well below mar-

ket. We believed that this would place the school system in the position of supporting long-term religious activities in the schools, in violation of the Constitution. To avoid this problem, we determined to charge an increasing rental rate after the fifth year of use, which would gradually approach the commercial rental rate that we charged to private users.

During the year 1991, about 8,500 groups applied for use of the public school facilities in Fairfax County, and in 1992, 51 churches were utilizing the facilities. Over the ten-year period prior to this litigation, the number of churches using school facilities in any given year ranged from 38 to 91.

Fairfax Covenant Church ("the Church"), an evangelical Christian church which was organized in 1980, currently has about 800 members. The Church began renting school facilities on Sunday mornings, beginning in 1980. Concerned about expending its five years of "low rent" before it was able to obtain its own facility, the Church rented space from another church for the two years between 1982 and 1984. Since 1984, it has rented space from the School Board in three separate schools. Since 1991, it has been renting the auditorium and several class-rooms at West Springfield High School. For the first five years, the Church paid rent at a level charged other nonprofit organizations. Then, because of the special rate charged to churches under Regulation 8420, the Church paid increasingly higher rent beginning in 1987, so that by 1991, it was paying five times the rate charged other nonprofit organizations. The aggregate amount of the increases paid by Fairfax Covenant Church for the period from 1987 through February 1993 was $287,456. Although Fairfax Covenant Church has purchased land for its own facility and raised approximately $2 million of the $3.3 million needed to build a facility, it contends that the escalating rent has had an adverse financial effect on it, making it more difficult for the Church to move from West Springfield High School.

In May 1992, Fairfax Covenant Church filed a complaint under 42 U.S.C. § 1983, alleging that the rental structure of Regula-

tion 8420 violated its First Amendment rights. It requested injunctive relief and demanded damages, with interest, for the rent charged in excess of that charged to other nonprofit organizations and churches which have not rented for more than five years.

Ruling on cross motions for summary judgment, the district court found that Regulation 8420 violated the Church's First Amendment rights. Relying principally on *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), and *Board of Education v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), the court concluded, "[T]his type of content-based regulation which unduly burdens speakers' free exercise of religious beliefs at a public forum, as is the Fairfax County School Board's policy, can only be justified by a compelling state interest." The court rejected the School Board's argument that its actions were justified by its concern about violating the Establishment Clause. The district court, however, refused to make its holding retroactive because to do so would produce "substantial inequitable results." The court observed that Fairfax Covenant Church brought this action only after it had been renting for 11 years, and, since other churches would also be benefited by the ruling, the School Board would be confronted with a significant liability. The court said, "[T]he School Board faces liability for its good faith attempt to avoid an Establishment Clause violation in the amount of greater than 1.1 million dollars."

From the district court's judgment, both parties appealed.

## II

The arguments of the School Board amount to the contention that the Establishment Clause of the First Amendment justifies the School Board's discriminatory treatment of churches in the rental structure established by Regulation 8420. The School Board argues that below-market rent charged to the churches and long-term or permanent use of school facilities by a church would advance or subsidize "the practice of religion" and therefore violate the Establish-

ment Clause. They take no issue with the district court's finding that the School Board has created a public forum by opening its facilities and that, therefore, the School Board is required to provide some access to these facilities. Thus, the School Board contends that this case may be decided only by resolving an "actual conflict" between the Establishment Clause and the Free Speech Clause or the Free Exercise Clause of the First Amendment.

The First Amendment states, to the extent applicable here, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech." U.S. Const. amend. I.

Applying the First Amendment to circumstances similar to those before us, the Supreme Court in *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), struck down a state university regulation which allowed a broad array of student groups to use university facilities, but denied religious groups from doing so. The Court held that when a state university creates a public forum by openly accommodating diverse student groups, it may deny a religious group access to that forum *only* upon a showing of some compelling state interest. Although the Supreme Court recognized that state institutions are not required by constitutional mandate to create public fora, the Court held that when they do, they cannot discriminate against or exclude student groups that wish to engage in religious worship and discussion, absent a justification that serves a compelling state interest and is narrowly tailored to achieve that interest. *Id.* at 269–70, 102 S.Ct. at 274–75. The state university in *Widmar* argued that its interest in maintaining the separation of church and state, deriving from the Establishment Clause, was a compelling state interest to justify its exclusion of the church group. Although the Court acknowledged that the university's interest in complying with the Establishment Clause "may be characterized as compelling," *id.* at 271, 102 S.Ct. at 275, it rejected the notion that allowing religious organizations access to an open forum tended to establish religion. The Court stated, "an

open forum in a public university does not confer any imprimatur of state approval on religious sects or practices," particularly when the forum is open to a "broad class of nonreligious as well as religious speakers." *Id.* at 274, 102 S.Ct. at 277. Noting that the Establishment Clause is limited by the Free Exercise Clause and the Free Speech Clause, the Court concluded, "[W]e are unable to recognize the state's interest [in maintaining a greater separation of church and state] as sufficiently 'compelling' to justify content-based discrimination against respondents' religious speech." *Id.* at 276, 102 S.Ct. at 278. Any advancement of religion was held to be "incidental" to the secular purpose of securing an open public forum.

■ In short, *Widmar* held that a policy of equal access to a public forum which allows for religious uses does not conflict with the Establishment Clause under the test adopted in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (A policy may withstand an attack that it violates the Establishment Clause if (1) it has a secular legislative purpose; (2) its principal or primary effect is not to advance or inhibit religion; and (3) it does not foster an excessive government entanglement with religion.).* The vitality of *Widmar* was reaffirmed recently in *Lamb's Chapel v. Center Moriches Union Free School Dist.,* — U.S. —, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *cf. Board of Education v. Mergens,* 496 U.S. 226, 247–49, 110 S.Ct. 2356, 2370–71, 110 L.Ed.2d 191 (1990) (plurality opinion) (applying *Widmar's* holding and analysis to similar issues under the Equal Access Act, 20 U.S.C. §§ 4071–4074).

■ We can find no basis to distinguish the circumstances essential to the Court's holding in *Widmar* from those of record here. *See also Lamb's Chapel,* — U.S. at — – —, 113 S.Ct. at 2147–48 (holding that access to public high school facilities available to a restricted scope of public groups was still subject to *Widmar* and could not be restricted on the basis of the user's religious perspective). We therefore conclude that Regulation 8420 discriminates against religious speech in violation of the Free Speech Clause.

Regulation 8420 also interferes with or burdens the Church's right to speak and practice religion protected by the Free Exercise Clause. *See, generally,* Michael W. McConnell, *Religious Freedom at a Crossroads,* 59 Chic.L.Rev. 115, 117 (1992) (noting that Free Exercise Clause is intended to preserve from undue government interference "full and equal" rights of religious believers "to define their own way of life, so long as they do not interfere with the rights of others"). Since the School Board is unable to advance a compelling state interest to justify Regulation 8420's discrimination against churches, we conclude that, in addition to violating the Church's free speech rights, Regulation 8420 also violates the Church's rights to exercise religion freely. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* — U.S. —, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (laws which discriminate on the basis of religion are valid only if narrowly tailored to serve a compelling state interest). .

■ Seeking to distinguish the circumstances that are essential to the holding of *Widmar* from the circumstances here, the School Board argues that the issue here is squarely one of determining whether below-market rents combined with long-term or permanent use by a church of public school facilities runs afoul of the Establishment Clause. It seeks to place this case within the scope of the exception described in *Widmar:* "At least in the absence of empirical evidence *that religious groups will dominate* UMKC's open forum, we agree with the Court of Appeals that the advancement of religion

---

* We are aware of the repeated criticisms of the *Lemon* test and are mindful that the test may be clarified in *Board of Education v. Grumet,* which the Supreme Court recently agreed to hear. — U.S. —, 114 S.Ct. 544, 126 L.Ed.2d 446 (1993). In his concurring opinion in *Lamb's Chapel,* — U.S. at —, 113 S.Ct. at 2150, Justice Scalia stated, "Over the years, however, no fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the creature's [*Lemon* test's] heart." Until *Lemon* is overruled, however, we are obliged to apply it, although we note that a standard more accommodating to the Free Exercise Clause would not change our decision here.

would not be the forum's 'primary effect.' " 454 U.S. at 275, 102 S.Ct. at 277 (emphasis added). The School Board's position is that long-term or permanent use of School Board facilities would constitute such domination. The empirical evidence of domination referred to in *Widmar*, however, is not fulfilled by the School Board's *anxiety* or *concern* about whether the empirical circumstances could exist in the future. Mere speculation that a nonexclusive access to a public forum might ripen into a violation of the Establishment Clause, absent any facts suggesting that probability, is not a justification sufficiently compelling to burden free access to the forum. Rather than having the effect of remedying the concern about the Establishment Clause, the School Board's policy of rent discrimination against religious organizations moves the School Board into a non-neutral, antireligion corner by burdening free speech and the free exercise of religion.

The School Board's concern about the establishment of religion is not only unfounded but is also reflective of a one-sided view of the First Amendment. The School Board created a public forum to which it provides access to all sorts of uses, including religious uses. In a given year, it receives approximately 8,500 applications for use of its 172 schools, about 50 of which are from churches. None of the users receives a lease for more than a year, and the Board has reserved the right to deny or terminate any use when to do so is "in the best interest of the school system." No evidence was presented that Fairfax Covenant Church dominated the School Board's rental capacity. Nor is there evidence that the Board had to deny anyone else access to the forum by reason of Fairfax Covenant Church's lease. Moreover, no one has even hinted that the current policy of providing religious groups access to public school facilities after hours shows a School Board preference for religion or for a particular sect of religion.

■ The School Board's expressed concern about subsidizing religious practice is likewise unfounded. It contends that its below-market rental rate to churches amounts to direct financial subsidy and therefore establishes a religion in violation of the Estab-

lishment Clause, relying on *School District of Grand Rapids v. Ball*, 473 U.S. 373, 385, 105 S.Ct. 3216, 3223, 87 L.Ed.2d 267 (1985) (holding that the Establishment Clause absolutely prohibits government-financed or government-sponsored "indoctrination into the religious beliefs of a particular religious faith"), and *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (holding as an improper subsidy the use of public funds to help construct buildings for religious colleges, where the government prohibits religious use of those buildings for only 20 years). These cases, however, do not control the circumstances here. Regulation 8420 charges churches that use the school for less than five years the same rate as it charges other nonprofit cultural and civic groups. This rent is designed to reimburse the School Board for any expense incurred by the use of the school. Rather than subsidizing a church user, such a cost-recovering rent in fact provides money to the School Board to offset its ongoing expenses for school facilities. This is particularly so since there is no evidence to suggest that the School Board's facilities are used to capacity and that the loss of a church user would be replaced by a private group paying market rental. In short, the argument that a direct subsidy is involved here lacks factual support.

Moreover, the Supreme Court in *Widmar* rejected these very arguments in circumstances completely analogous to those presently under consideration. In holding that the costs of *maintaining a public forum* do not advance the views and beliefs of those using the forum, the Supreme Court rejected the applicability of *Tilton* to these circumstances. It said:

> In *Tilton* the Court was concerned that a sectarian institution might convert federally funded buildings to religious uses or otherwise stamp them with the imprimatur of religion. But nothing in *Tilton* suggested a limitation on the State's capacity to maintain forums equally open to religious and other discussions. Cases before and after *Tilton* have acknowledged the right of religious speakers to use public forums on equal terms with others.

454 U.S. at 273 n. 12, 102 S.Ct. at 276 n. 12.

■ The question of how sustained a religious use of a public forum or preoccupying

that use must be in order to constitute a domination of the forum is a factual one. The record in this case contains no evidence to suggest that the School Board's maintenance of a public forum, to which a wide array of nonreligious and religious speakers are permitted to come, is interpreted by the community to constitute a religious endorsement by ·the School Board. *See Lamb's Chapel,* —— U.S. at ——, 113 S.Ct. at 2148. Moreover, the School Board must remain mindful of its obligation, when providing a public forum, of preserving the public's rights under the Free Exercise Clause. Accordingly, we affirm the district court's ruling that Regulation 8420, which adopted a rate structure that discriminates against religious uses of the School Board's public forum, violates the Free Speech and Free Exercise Clauses of the First Amendment.

### III

In its appeal, Fairfax Covenant Church contends that the district court erred in concluding that "the retroactive application of its decision is not warranted." Relying on *American Trucking Associations v. Smith,* 496 U.S. 167, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990) (plurality opinion), and *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the district court concluded that because the School Board acted in good faith and the Church waited 11 years to file, it would be inequitable to assess damages, particularly since this case may generate further suits. It estimated that the School Board's total exposure would exceed $1.1 million. Taking these findings together with the observation that an award of damages would not further "the principle of treating similarly those religious and nonreligious groups using an open public forum," the district court concluded that "retroactive application of its decision is not warranted."

■ Before reviewing the district court's application of the *Chevron* criteria to this case, a review of the principles governing retroactivity of judicial decisions is useful. It is axiomatic in our system that courts, when announcing their decisions, decide actual cases and controversies, *see* U.S. Const., art. III, § 2, and that courts are not charged

with responsibility for making new, prospective rules for society. That function is typically legislative. When a legislature enacts rules for prospective application to society, it cannot practicably anticipate all the circumstances to which its enactments might apply, or how they might apply. Its enactments are, of necessity, general. Courts, presented with actual cases and controversies, must particularize their rulings, and in that context they may announce results or interpretations not previously , obvious or which change earlier interpretations. To that extent, these court decisions might be thought to contribute "new law." But even then, the decisions almost always apply retroactively because they apply and interpret rules and principles that governed the conduct of the parties at the time that the controversy arose.

Retroactive application of decisions is thus the rule inherent in the judicial function.

■ Beginning with *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) (in the context of a criminal case), and *Chevron Oil* (in the context of a civil case), the Supreme Court began with greater frequency to apply decisions prospectively where circumstances indicated an unusually disruptive or inequitable result if a decision announcing a "new law" were to be applied retroactively. Sometimes, the prospective application was limited to the case before the Court, so-called "selective prospectivity," and in other cases the prospective application applied to all cases then pending, so-called "pure prospectivity." In *Chevron,* the Court announced a test for determining when court decisions may be applied prospectively:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation."

Finally, we have weighed the inequity imposed by retroactive application, for "where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." 404 U.S. at 106, 92 S.Ct. at 355 (internal citations omitted).

Only recently has the Supreme Court cast serious doubt upon the practice of departing from the traditional rule of retroactive applications. *See Harper v. Virginia Dept. of Taxation,* — U.S. —, —, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases...."); *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (opinions of Justices Souter, White, Scalia and Blackmun, representing the views of six justices). Though the precise issue in *Harper* was so-called "selective prospectivity," every indication in the opinion of the Court is that its logic would also forbid all types of prospectivity. *See Harper,* — U.S. at —, 113 S.Ct. at 2517 ("Our approach to retroactivity heeds the admonition that 'the Court has no more constitutional authority in civil cases than in criminal cases to disregard current law....'"); *id.* — U.S. at —, 113 S.Ct. at 2527 (O'Connor, J., dissenting) ("Rather than limiting its pronouncements to the question of selective prospectivity, the Court intimates that pure prospectivity may be prohibited as well."). It might not be reading too much into *Harper* and *James B. Beam* if we were to conclude that *Chevron,* adopting the test for determining when cases may be enforced prospectively, has lost all vitality. We are struck, however, by the notable absence in *Harper* of any statement that *Chevron* is overruled for use in civil cases involving a question of "pure" prospectivity or that all prospective decisionmaking is prohibited. Nevertheless, even if *Chevron* criteria are applied to the circumstances of this case, we conclude it was error for the district court to have refused to apply its decision retroactively.

In the case before us, the first two factors of *Chevron* need not be analyzed further, since they have already been disposed of by our analysis on the merits. As we noted, we are satisfied, as was the district court, that the holding in *Widmar,* a 1981 decision, unremarkably controls the decision here and that the district court did not establish a new principle. It is the third factor of *Chevron,* which takes into account *inequities* of applying the normal rule of retroactivity, that the district court relied on to apply its ruling prospectively. In support of its ruling, the court noted that the defendant acted in good faith, that the plaintiff waited 11 years to file its suit, and that the amount of damages is substantial. While the district court was properly concerned with the public welfare, it failed to appreciate that its decision was readily foreseeable in light of *Widmar,* and that defenses available to the School Board in the litigation will help substantially to ameliorate its financial exposure.

■ The good faith of a defendant, relied on by the district court, may be relevant when the elements of a cause of action, or where a defense to it, depend on the defendant's state of mind. Moreover, *bad* faith may be relevant to preclude any equitable application of the law. But in the circumstances here, whether the defendant acted in good faith is irrelevant and barely contributes to any possibility of an inequity. If the School Board was wrong, even innocently, it should not be allowed to retain illegally collected rent.

With respect to the $1.1 million damages exposure, we are also not impressed. In this case, the claim is for slightly more than $280,000, plus interest. That amount, moreover, is subject to any defenses pleaded by the School Board, such as laches and limitations. Against an annual operating budget of $850 million, we cannot say that the potential award in this case is so substantial as to fall under the inequitable-result exception in *Chevron.* As for other claimants who might benefit from this decision, their claims, if they can be established, would also be subject to limiting defenses. To speculate here

on the possible awards that might be entered would be of no benefit to the discussion.

Finally, any inequity arising from the fact that Fairfax Covenant Church waited 11 years to file suit will be directly offset by the application of the doctrine of laches and limitations when this case is remanded.

For the reasons given, we affirm the district court's ruling which found Regulation 8420 unconstitutional, but conclude that the district court erred in failing to follow the normal rule that its decision apply retroactively. Accordingly, we vacate the judgment and remand this case for further proceedings not inconsistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*

