IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 99-31071
Consolidated with No. 99-31140

---

SALLY CAMPBELL;
LOUISIANA CHRISTIAN COALITION,

Plaintiffs-Appellees,

versus

ST. TAMMANY PARISH SCHOOL BOARD; EDDIE FIELDING, in his official capacity as a member of the St. Tammany Parish School Board; A.R. SMITH, also known as Smitty Smith, in his official capacity as a member of the St. Tammany Parish School Board; GREGORY J. SAURAGE, in his official capacity as a member of the St. Tammany Parish School Board; DONALD J. VILLERE, in his official capacity as a member of the St. Tammany Parish School Board; PATTI YOUNG, in her official capacity as a member of the St. Tammany Parish School Board; DANIEL G. ZECHENELLY, in his official capacity as a member of the St. Tammany Parish School Board; BETTY VERZWYVELT, in her official capacity as a member of the St. Tammany Parish School Board; JOHN C. LAMARQUE, in his official capacity as a member of the St. Tammany Parish School Board; E. ROTH ALLEN, in his official capacity as a member of the St. Tammany Parish School Board; JAMES PANKS, SR., also known as Ronnie Panks, Sr., in his official capacity as a member of the St. Tammany Parish School Board; ANTHONY TEDESCO, also known as Tony Tedesco, in his official capacity as a member of the St. Tammany Parish School Board; RAY A. ALFRED, in his official capacity as a member of the St. Tammany Parish School Board; MARY K. LYNCH, in her official capacity as a member of the St. Tammany Parish School Board; CHARLES T. HARRELL, in his official capacity as a member of the St. Tammany Parish School Board; NEAL M. HENNEGAN, in his official capacity as a member of the St. Tammany Parish School Board; LEONARD P. MONTELEONE, in his official capacity as Superintendent of the St. Tammany Parish School Board; WILLIAM B. BRADY, in his official capacity as Administrative Supervisor of the St. Tammany Parish School Board,

Defendants-Appellants.

Appeals from the United States District Court
For the Eastern District of Louisiana, New Orleans

ORDER ON PETITION FOR PANEL REHEARING

(Opinion 3/9/00, 5 Cir., _____, _____ F.3d _____ )

Before POLITZ, JOHN R. GIBSON,[*] and HIGGINBOTHAM, Circuit Judges.

PER CURIAM:

We held that the First Amendment does not force the St. Tammany Parish School Board to permit partisan political activity, for-profit fund-raising, and "religious services" in a limited public forum, reserved for recreational and civic activities. The entire court has refused to reconsider the panel's opinion. The panel has refused to reconsider for the reasons we will explain.

St. Tammany policy permits "the use of some of the public school buildings as a limited public forum."[1] The policy permits "civic and recreational meetings and entertainment and other uses pertaining to the welfare of the community."[2] Basketball games, Scout meetings, and dance or music recitals were the overwhelming uses of the facilities disclosed by the record.[3] While the policy

---

[*] Circuit Judge of the Eighth Circuit, sitting by designation.

[1] St. Tammany Parish School Board, Use of School Facilities Policy (Nov. 13, 1997). There is a complete stipulation covering the use of school facilities under the rules at issue here suggesting in part that many groups like to play basketball.

[2] Id.

[3] There is a complete stipulation covering the use of school facilities under the rules at issue here suggesting in part that

did not attempt to restrict First Amendment activity attendant to such civic or recreational uses,[4] it did exclude partisan political activity, for-profit fund-raising, and "religious services or religious instruction."[5]  Tracking the prohibitions of the rule, plaintiffs requested permission to use St. Tammany's facilities on a specific occasion "to worship the Lord in prayer and music" and to "pray about" and "engage in religious and Bible instruction with regard to" various issues.[6]  The school district denied the request, and the plaintiffs filed suit.  The district court granted summary judgment for the plaintiffs, persuaded that the rule was too vague.  We reversed.

I

We remain convinced that St. Tammany has not created a public forum.  The government, when it chooses to open a forum, necessarily has leeway to establish the terms upon which the forum is opened.  Thus, for example, in Lehman v. City of Shaker Heights,[7] a city government had the prerogative to exclude political advertising, even though it generally allowed commercial

_____

many groups like to play basketball.

[4] Compare Bd. of Airport Comm'rs v. Jews for Jesus, 482 U.S. 569 (1987) (striking down a categorical ban on First Amendment activity in airports).

[5] Id.

[6] Campbell v. St. Tammany's Sch. Bd., 206 F.3d 482, 484 (5th Cir. 2000).

[7] 418 U.S. 298 (1974).

advertising on city busses.[8]  This even though political speech lies at the core of the First Amendment.  St. Tammany has done no more than exercise that leeway.  It does not censor First Amendment activity attendant to the civic or recreational use of school facilities.  It merely forbids three activities, albeit expressive activities: partisan political activity, for-profit fund-raising, and religious services.

Since a middle school is not a traditional public forum,[9] the type of forum created by the St. Tammany policy is a function of the intent of the Board.  As the Supreme Court held in Cornelius v. NAACP Legal Defense and Educational Fund,[10]

> The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum.  The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent.[11]

Here, the intent of St. Tammany is abundantly clear.  The policy begins by indicating that it seeks to create "a limited public

---

[8] 418 U.S. at 300-02.

[9] See Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267 (1988) ("The public schools do not possess all of the attributes of streets, parks, and other traditional public forums . . . .").

[10] 473 U.S. 788 (1985).

[11] 473 U.S. at 802.

forum."[12]  That intent, to limit use of the forum, is reinforced by the restrictions imposed in the policy: no partisan political activity, no for-profit fund-raising, and no religious services. These evenhanded exclusions, which the record shows to have been uniformly enforced, also rebut any inference that the purpose statement is somehow pretextual, or made in bad faith.  That St. Tammany does not censor speech incident to the civic and recreational uses for which the forum was opened, even specifically including religious viewpoints, "does not imply that the forum thereby becomes a public forum for First Amendment purposes."[13]  It merely implies that St. Tammany assiduously avoided viewpoint discrimination, while still limiting the purposes for which it opened its schools.

St. Tammany has not permitted an indiscriminate range of uses. Express permission, almost always in writing, is required before using any of the school facilities.  Many groups use the facilities, but for only a handful of purposes.  Although "civic and recreational" uses might have a quite different meaning in San Francisco or Chicago, the local school board, familiar with St. Tammany Parish culture, knew what "civic and recreational" uses meant in St. Tammany.  Their expectations regarding the activities they were permitting were not disappointed, and the uses made of

---

[12] St. Tammany Parish School Board, Use of School Facilities Policy (Nov. 13, 1997).

[13] 473 U.S. at 805.

5

school facilities in no way frustrated the board's explicit purpose of creating a limited public forum. For example, well over half of the uses reported in the record are affirmatively described as sports, dance or music recitals, or Scouting events.[14] The record affirmatively reflects that almost seventy-five percent of all uses were for activities directly related to students, including PTA meetings, standardized tests, and graduations. Although the record shows some that civic groups, such as the Chamber of Commerce or homeowners' associations, occasionally met in a school cafeteria, the record contains no evidence of the content of the programs, beyond occasional annotations referring to annual teas or banquets. Some plainly were relevant to students; a Lion's Club, for example, "adopted" a school. In sum, the record shows that St. Tammany schools were overwhelmingly used by groups for activity of interest to students or parents. Such a limited set of uses does not create a public forum, as the Supreme Court held in <u>Perry Education Association v. Perry Local Educators' Association</u>:

> We can only conclude that the schools do allow some outside organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities. This type of selective access does not transform government property into

---

[14] While groups having a religious character often used the schools, the record reveals that those groups almost always played basketball: "Knights of Columbus: Hoop Shots"; "Starlight Baptist: Basketball Practice." The Fellowship of Christian Athletes apparently shares this proclivity for basketball. One request for use read: "We need a place to practice [basketball] because Slidell High's gym is being used for Fellowship of Christian Athletes." This is in fact the only mention in the record of use by this group, despite Plaintiffs' efforts to highlight it.

> a public forum. . . . Moreover, even if we assume that by granting access to the Cub Scouts, YMCA's, and parochial schools, the School District has created a "limited" public forum, the constitutional right of access would in any event extend only to other entities of similar character. While the school mail facilities thus might be a forum generally open for use by the Girl Scouts, the local boys' club, and other organizations that engage in activities of interest and educational relevance to students, they would not as a consequence be open to an organization such as PELA, which is concerned with the terms and conditions of teacher employment.[15]

On the record of this case St. Tammany has not created a public forum. It limited use at all times, and the uses it allowed are overwhelmingly typical interests and activities of students and parents – mostly recreation and sport.

St. Tammany is attempting to open its school facilities. A contrary holding would frustrate that objective and diminish, rather than increase, opportunities for freedom of speech. Under the Supreme Court's jurisprudence, a government entity such as a school board has the opportunity to open its facilities to activity protected by the First Amendment, without inviting political and religious activities presented in a form that would disserve its efforts to maintain neutrality. We are persuaded that the Constitution does not deprive local school boards of that choice, and courts stand ready to hear complaints of pretext or bad faith. Were we to hold otherwise, a school board would be put to a choice of maintaining a public forum or no forum at all. Just as church

---

[15] Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 47-48 (1983) (emphasis added).

services could not be excluded from a public forum, neither could partisan political activities or for-profit fund-raising. There is no "in between" forum in which religious services must be allowed but partisan political activity can be banned. The concept of a limited public forum does not permit such preferences – a preference for religion that itself could be seen as viewpoint based.[16] Nor could St. Tammany allow civic and recreational uses, but categorically bar all attendant First Amendment activity.[17] Thus, if St. Tammany cannot define and limit the forum it creates, it may have no alternative but to close its doors to all after-hours activity.

## II

We remain convinced that St. Tammany's policy is not viewpoint discriminatory. By its plain language, St. Tammany's policy permits the expression of religious viewpoints. Immediately after the provision challenged here, barring "religious services or religious instruction on school premises," the policy goes on to state: "However, the use of school facilities by outside organizations or groups outside school hours for the purpose of *discussing religious material* or material *which contains a religious viewpoint* or for distributing such material is

---

[16] See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 652–53 (1981).

[17] See Jews for Jesus, 482 U.S. at 577.

8

permissible if it does not interfere with one of the primary uses of such facilities."[18] The policy's express tolerance of discussion from a religious viewpoint rebuts any inference of viewpoint discrimination.

St. Tammany's policy is supported by rational reasons sufficient to rebut any inference that its decision to exclude religious services was viewpoint discriminatory. Especially where, as here, the school district has affirmative evidence that its motive was not viewpoint discrimination,[19] such reasons need only be rational. They need not be compelling. St. Tammany has not singled out religious speech for unfavorable treatment. What St. Tammany has done is to prohibit three forms of potential *activities* that might erode the neutrality of the schools. St. Tammany bars partisan political activity, lest the schools be drawn into partisan frays or give an appearance of support for Democrats or Republicans. St. Tammany bars religious services, lest the schools appear to prefer Christians or Muslims, and religion over non-religion.[20] It does not matter that the Establishment Clause does

_____

[18] St. Tammany Parish School Board, Use of School Facilities Policy (Nov. 13, 1997) (emphasis added).

[19] The provisions of St. Tammany's policy that expressly permit discussion of religious viewpoints provide affirmative evidence that the policy is not driven by viewpoint discrimination.

[20] This parallelism raises the question of how far the Plaintiffs would take their reasoning. Would not St. Tammany also be required to allow Democrats and Republicans to hold rallies on school campuses? See Heffron, 452 U.S. at 652-53.

9

not require St. Tammany to exclude religious services. The school board could rationally decide as it did in discharging the duty of evenhanded treatment. Nor does it matter that federal judges would cast a different vote were they members of the school board, or that political winds encourage such views – at least, it should not matter.

This distinction, between prohibiting religious services and prohibiting expression from a religious viewpoint, is no more conceptually difficult than the distinction between prohibiting picketing and prohibiting all picketing except that which bears on a labor dispute.[21] A religious service is an activity, a manner of communicating which carries a very special and distinct meaning in our culture. While a service may express a religious viewpoint, for example, a Catholic mass featuring a prayer for the welfare of the unborn and for the reform of American abortion law, the distinction is between medium and message.[22] Under St. Tammany's

---

[21] See Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95-97 (1972) (noting that the "operative distinction is the message on the picket sign," and explaining past jurisprudence as "condemn[ing] . . . discrimination among different users of the same medium of expression").

[22] Widmar v. Vincent, 454 U.S. 263, 269 (1981), is not to the contrary. As the Supreme Court made clear in Cornelius, the University in Widmar had "evidenced a clear intent to create a public forum." 473 U.S. at 802. The error made by the University, which Widmar corrected, was the "erroneous conclusion that the Establishment Clause required the exclusion of groups meeting for religious purposes." 473 U.S. at 803. Here, by contrast, St. Tammany has evidenced, by its rules and by the manner of enforcement, a clear intent to create only a limited public forum.

10

policy, thus, a Catholic group could assemble on school property to "discuss" a Christian anti-abortion viewpoint and "distribute . . . material" advocating a Christian anti-abortion viewpoint.  They would only run afoul of the policy if they also chose to "conduct religious services."[23]

"[R]eligious organizations" do not "enjoy rights to communicate . . . superior to those of other organizations having social, political or ideological messages to proselytize."[24]  In this case, St. Tammany decided that it did not wish to create a public forum.  Rather, it preferred a policy of not restricting free expression attending the permitted uses of school facilities, while still avoiding forms of expressive activity that it believed eroded its goal of neutrality.  No one in this case contends that St. Tammany is guilty of viewpoint discrimination because it bars partisan political activity.  Insisting here that St. Tammany's ban on religious services is unconstitutional looks less like a reach for equal treatment, and more like a reach for an affirmative preference for religious speakers over political speakers.

### III

In denying rehearing we note that in the present case, the Plaintiff specifically requested accommodations for a single

---

[23] The churches of St. Tammany Parish have little or no interest in using a school facility for such purposes, as a scan of the uses made discloses.

[24] Heffron, 452 U.S. at 652-53.

program of religious worship and instruction. The carefully framed request for use did not propose to lecture or teach religion or religious tenets. The Coalition's request and the St. Tammany rules are fairly read to speak to worship services. St. Tammany policy follows its prohibition of religious instruction with an explicit statement that "discussing religious material or material which contains a religious viewpoint" is permitted. Read in context, the distinction between religious instruction as part of a religious service and instructing on the matter of religion is clear. St. Tammany's rules need not be read to prohibit the latter.[25] In any event, that question is not presented in this case.

IV

Plaintiffs draw to our attention the Supreme Court's decision to grant certiorari in *Good News Club v. Milford Central School.* This case, however, is materially different.[26] The Milford policy provides that "School premises shall not be used . . . for religious purposes."[27] There is a powerful argument that such a prohibition against the use of facilities for a religious <u>purpose</u> is facially invalid as inevitably presenting viewpoint

---

[25] <u>See</u> <u>Bronx Household of Faith v. Cmty. Sch. Dist. No. 10</u>, 127 F.3d 207, 217 (2d Cir. 1997) (Cabranes, J., concurring in part and dissenting in part).

[26] 202 F.3d 502 (2d Cir. 2000), *cert granted* 2000 WL 838152.

[27] 202 F.3d at 507.

discrimination. This sharply contrasts with St. Tammany Parish's prohibition of a religious <u>service</u>. The purpose of the speaker is not the inquiry in St. Tammany Parish. Nor does it present the question of religious instruction. In St. Tammany Parish the request was to "worship the Lord in prayer and music . . .," as we have explained.

The baseline of both the majority and the dissenting opinions in the Second Circuit's decision in *Good News Club* was that a worship service could properly be excluded. In the limited forum created by St. Tammany Parish, there is no restriction upon religious activity, including teaching from a religious perspective, attending use of the school facility unless it was partisan political activity, for profit activity, or a religious service. To illustrate our point, as we have read the St. Tammany Parish rule, encouraging children to memorize Bible verses with opening and concluding prayer may be a religious activity, it may have a religious purpose, but it would not be prohibited as a religious service. St. Tammany Parish's rule against religious service is facially valid, and there is no evidence that its efforts to create a limited public forum or its application of its rules are a pretext for viewpoint-based discrimination. Fairly read in context, the rule draws a clear common sense distinction. That the meaning of a rule prohibiting a religious service can be taxed at its margins is no fatal vice. It is understandable and

13

falls far short of an unlicensed power to censor. The evenhandedness of St. Tammany's regulations of its school facilities belies any contrary suggestion.

V

Treating the Petition for Rehearing En Banc as a Petition for Panel Rehearing, the Petition for Panel Rehearing is DENIED. The court having been polled at the request of one of the members of the court and a majority of the judges who are in regular active service not having voted in favor (FED. R. APP. P. and 5TH CIR. R. 35), the Petition for Rehearing En Banc is DENIED.

EDITH H. JONES, Circuit Judge with whom SMITH, BARKSDALE, EMILIO M. GARZA, and DeMOSS, Circuit Judges dissenting from the denial of rehearing en banc:

This is an equal access case. The question is whether public authorities may exclude "religious services or religious instruction" as after-hour rental uses of school facilities, when they have permitted all other uses consistent with the "welfare of the public", except partisan political activity[28] and for-profit fund-raising. In upholding this blatant discrimination against religious speech a panel of our court seriously erred. Campbell v. St. Tammany Parish Sch. Bd., 206 F.3d 482 (5th Cir. 2000). Its opinion conflicts with the Supreme Court's equal access and viewpoint discrimination cases, decisions of five other circuit courts, and previous Fifth Circuit cases. We dissent from the denial of *en banc* review.

The facts are straightforward. The St. Tammany Parish School Board allows after-hours use of its facilities for civic, social and recreational purposes, subject to the exceptions noted above. Over sixty buildings have been opened to hundreds of community groups.[29] But Sally Campbell and the Christian Coalition

---

[28] No issue of partisan political use of the school buildings is before us in this case.

[29] These include the Fellowship of Christian Athletes; Mt. Zion Methodist Church Annual Tea; Wildlife and Fisheries Hunter

were, under this policy, denied permission to use the facilities to discuss educational, family and political issues, to pray about those issues, to teach the Bible with regard to those issues, and to worship God in prayer and music.

As the panel noted, this case turns initially on what type of expressive forum the school board created. When public facilities are available "for indiscriminate use by the general public", a designated public forum exists, and content-based exclusion of speakers must survive strict scrutiny review. Perry Education Ass'n. v. Perry Local Educators' Ass'n., 460 U.S. 37, 47, 103 S.Ct. 948, 956 (1983). If, however, because of the narrow scope of its intended use, a forum is non-public, then reasonable, viewpoint-neutral content restrictions may be imposed. *See, e.g.* Perry 460 U.S. at 47, 103 S.Ct. 956 (teachers' mailboxes are a nonpublic forum); Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 113 S.Ct. 2141 (1993) (excluding religious

---

safety training; Southeastern University Community Education Classes; Mary Dee's Dance Studio recital; church black history program; Young Marines meeting; Knights of Columbus meeting; Pride-Rape defense program, etc. The St. Tammany School facilities have been used for a variety of other purposes, such as: Righteous Rumble Youth Conference; Brugier Homeowner's Association Candidate Forum; Northshore DARE Association Meeting; Willow Wood Homeowner's Association meeting; Folsom Native Plant Society meeting; Northwest St. Tammany Civic Association meeting; Primary Colors Pre-school Christmas program; Relay for Life Cancer fundraiser; Pearl River Volunteer Fire Department banquet; First Church of God banquet; Drainage Board meeting; Gold Wing Riders benefit; Boy and Girl Scouts meetings; Young Blood International seminar; wedding reception; EPA meeting; Kiwanis Club breakfast; Sister-to-Sister conference; and Commission on Families fair.

viewpoint from access to after-hours use of school facilities is unconstitutional).

The panel's first error lies in its allowing St. Tammany's policy to dictate what type of forum exists. The panel observes the Board's written limits on use of school facilities and concludes that, because political and for-profit fundraising activities are prohibited as well as religious instruction or worship, the Board was not solely motivated to discriminate against religious speech. Further, the district policy restricts "more types of uses" than a policy that the Second Circuit held did not create a public forum. <u>Bronx Household of Faith v. Community Sch. Dist. No. 10.</u>, 127 F.3d F.3d 207, 210 (2nd Cir. 1997). Implicitly, the panel holds that the panoply of what the school district permits is less important to the forum determination than the speech it excludes.[30]

With due respect, the panel is looking through the wrong end of the telescope. Such a narrow view of the conditions under which a designated public forum can arise is incorrect. "The Constitution forbids a state to enforce certain exclusions from a <u>forum generally open to the public</u>, even if it was not required to create the forum in the first place." <u>Widmar v. Vincent</u>, 454 U.S.

---

[30]For reasons that are not clear, the panel in its lengthy order on panel rehearing, no longer perceives this as a "minimally sufficient" case to maintain the school buildings' status as a non-public forum. <u>See</u> <u>Campbell</u>, 206 F.3d at 487.

17

263, 267-68, 102 S.Ct. 269, 273 (1981) (emphasis added). *See also* Perry, 460 U.S. at 45, 103 S.Ct. at 955.  All that is required is that the forum be "generally open" to the public: "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say."  Police Department of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290 (1972) (emphasis added).  *See* Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267, 108 S.Ct. 562, 568 (1988)(public facilities opened for indiscriminate use by the general public "or by some segment of the public" are designated public fora).

Also pertinent for present purposes, the Supreme Court has strongly suggested that a designated public forum is created when a school district, which purports to prohibit after-hours "religious uses" of public facilities, nevertheless allows access by a wide variety of private organizations, including some that may have carried out religious purposes.  *See* Lamb's Chapel, 508 U.S. at 391, 113 S.Ct. at 2146 (1993);[31] *see also* Bronx Household, 127 F.3d

---

[31]     "The Church argued below that because under Rule 10 of the rules issued by the District, school property could be used for 'social, civic, and recreational' purposes, the District had opened its property for such a wide variety of communicative purposes that restrictions on communicative uses of the property were subject to the same constitutional limitations as restrictions in traditional public forums such as parks and sidewalks.  Hence, its view was that subject matter or speaker exclusions on District property were required to be justified by a compelling state interest and to be narrowly drawn to achieve that end. . . .  The argument has considerable force, for the District's property is heavily used by

18

207, 218 (2nd Cir. 1997)(Cabranes, J., concurring and dissenting) (noting that <u>Bronx Household</u> is bound to non-public forum description of school district policy by circuit precedent, notwithstanding "anvil-like hint" in <u>Lamb's Chapel</u>.

Contrary to the panel decision, most circuit courts have recognized that the government "create[s] a public forum by allowing diverse groups to use its auditorium." <u>Concerned Women for America, Inc. v. Lafayette County</u>, 883 F.2d 32, 34 (5th Cir. 1989). That a public school rather than a university or library or ballpark is the facility in question makes no difference. *See* <u>Grace Bible Fellowship</u> 941 F.2d 45 (1st Cir. 1991)(Breyer, J., on the panel); <u>Gregoire v. Centennial Sch. Dist.</u>, 907 F.3d 1366 (3rd Cir. 1990). It is what the school district "does, not what it says" that determines the type of forum. <u>Gregoire</u>, 907 F.2d at 1374 (citing <u>Board of Education v. Mergens</u>, 496 U.S. 226, 244, 110 S.Ct. 2336, 2369 (1990)). Were it otherwise, a public body could unilaterally narrow a designated public forum so as to exclude disfavored groups, cynically circumventing the Supreme Court's public forum jurisprudence. This court and others have thwarted such obvious machinations. <u>Gregoire</u>, 907 F.2d at 1378; <u>Hays County Guardian v. Supple</u>, 969 F.2d 111, 117-18 (5th Cir. 1992).

---

a wide variety of public organizations, including some that presented a "close question," which the Court of Appeals resolved in the District's favor, as to whether the District had in fact already opened its property for religious uses." [footnote omitted] (emphasis added) <u>Lamb's Chapel</u>, *id.* at 2146.

Since the broad "welfare of the community" standard and the actual use of the facilities, rather than the district's exclusion of three categories of speech, determine the type of forum, it should have been plain that the St. Tammany policy created a limited public forum. *See, e.g.,* Grace Bible Fellowship, 941 F.2d at 47; Gregoire, 907 F.2d at 1374, 1375. Cases in which non-public fora were found, by contrast, were those in which the forum is not dedicated to general debate or the free exchange of ideas, or the nature of the property is "inconsistent with expressive activity." Cornelius v. NAACP Legal Defense and Education Fund, 473 U.S. 788, 803, 105 S.Ct. 3439, 3449 (1985).[32] Neither of those descriptions accords with St. Tammany's policy or practice.

Under the proper test, the district facilities were open "indifferently"[33] for use by private groups. The content-based exclusion of religious speakers from access to the facilities is

---

[32] The various cases finding that a non-public forum existed are clearly distinguishable from the present factual situation. *See* Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714 (1974) (limited access to advertising space on buses); Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211 (1976) (military base is a non-public forum); Adderley v. Florida, 385 U.S. 39, 87 S. Ct. 242 (1966) (jailhouse grounds not public forum); Cornelius, 473 U.S. 788, 105 S.Ct. 3439 (1985) (federal work place exists to accomplish the business of the employer and is thus not open to all charitable organizations. *See also* Perry, 460 U.S. at 47, 103 S.Ct. at 956).

[33] Knights of the Ku Klux Klan v. East Baton Rouge Parish Sch. Bd., 578 F.2d 1122 (5th Cir. 1978).

censorship pure and simple. <u>Grace Bible Fellowship</u>, 941 F.2d at 47. As the Supreme Court explains,

> If a state refused to let religious groups use facilities <u>open to others</u>, then it would demonstrate not neutrality but hostility toward religion. "The Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities."

<u>Board of Education of Westside Community Schools Mergens</u>, 496 U.S. 226, 248, 110 S.Ct. 2356, 2371 (1990) (citing <u>McDaniel v. Paty</u>, 435 U.S. 618, 641, 98 S.Ct. 1322, 1335 (1978) (Brennan, J., concurring in judgment)) (emphasis added).[34]

The panel's second error was to construe the board's policy, if it legitimately created a non-public forum, as maintaining both a reasonable and viewpoint-neutral content restriction against religious worship and instruction. In a nonpublic forum, "content discrimination may be permissible if it preserves the purposes of that limited forum, [but] viewpoint discrimination . . . is presumed impermissible when directed against speech otherwise within the forum's limitations."

---

[34]  *See also* <u>Widmar</u>, 454 U.S. at 269, 102 S.Ct. at 274. (if the government creates a "generally open forum," it cannot discriminate against groups "engag[ing] in religious worship and discussion [since] [t]hese are forms of speech and association protected by the First Amendment.") So much for the panel's attempted distinction between religious meetings and "religious instruction and worship."

<u>Rosenberger v. Rector and Visitors of the Univ. of Virginia</u>, 515 U.S. 819, 829-30, 115 S.Ct. 2510, 2517 (1995).

The panel opinion says nothing about the policy's reasonableness, which must be judged in light of the forum's general "welfare of the public" standard. The omission is particularly curious given the Supreme Court's criticism in <u>Lamb's Chapel</u> that the lower court there had failed to examine the reasonableness of a restriction against using school buildings after-hours for "religious purposes". One would suppose that without a finding of its reasonableness vis à vis the scope of the forum, a content restriction is doomed. <u>Lamb's Chapel</u>, 508 U.S. at 393 n. 6, 113 S.Ct. at 2147 n. 6.

The policy is, in any event, unreasonable. Perhaps it was motivated by fear that public schools would become the font of off-hours sectarian activity, but there is no record evidence of this. If, on the other hand, the fears relate to excessive use of the facilities, the district could review its custodial regulations to assure that all off-hours costs were recovered. But there is no evidence of these fears, either. *Compare* <u>Fairfax Cov. Church v. Fairfax County School Board</u>, 17 F.3d 703 (4th Cir. 1994). Finally, no legitimate establishment clause violation occurs from allowing religious groups equal access to after-hours rentals.[35]

---

[35] "It does not violate the Establishment Clause for a public [school] to grant access to its facilities on a religion-neutral basis to a wide spectrum of ... groups, including groups

22

The crux of the issue is this: when measured against the "welfare of the public standard," how can the prohibition of religious worship or instruction be anything other than viewpoint discrimination?  Even the Second Circuit understood that religious worship services are "the ultimate in speech from a religious viewpoint" Bronx Household, 127 F.3d at 215.  To describe the exclusion as covering "religious activity" somehow outside the pale of the community's welfare makes no sense.  Such a distinction not only invites active censorship by the St. Tammany School Board – *e.g.*, does a prayer or Christian exhortation at the Fellowship of Christian Athletes meeting make it a religious worship service?[36] – but it flatly discriminates against those who practice, rather than simply profess or talk about, religion.  Both of these effects have been condemned by the Supreme Court's equal access jurisprudence.

Most recently, the Court ruled that when a university funds student publications generally, and does not exclude religion as a subject matter, it is unconstitutional for the school to

---

that use meeting rooms for sectarian activities, accompanied by some devotional exercise." Rosenberger, 515 U.S. at 842, 115 S.Ct. at 2523.  Since the facilities are used after-hours, there is no threat of a captive audience; since the facilities are used by a variety of groups, there is no threat of the schools' endorsing religion: "[B]y creating a forum the [school] does not thereby endorse or promote any of the particular ideas aired there." Widmar, 454 U.S. at 271 n.10, 102 S.Ct. at 275 n.10.

[36]     *see* n.2 *supra*.

discriminate based on some speakers' religious viewpoint. *Rosenberger*, *supra*. Allowing the Fellowship of Christian Athletes, the Knights of Columbus and other religious groups to use the St. Tammany facilities demonstrates, along with the board's broad written access policy, that religious subject matter is not excluded from after-hours rentals. *Rosenberger* made plain that "the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and even-handed policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Rosenberger*, 515 U.S. at 839, 115 S.Ct. at 2521; *see also* O'Connor, J. concurring, (emphasizing that exclusion of religious groups would evince hostility to religion), 515 U.S. at 846 n. 5, 115 S.Ct. at 2525 n. 5. *Rosenberger* condemned the imposition of viewpoint distinctions by the university that would inevitably lead to "governmental censorship, to ensure that all student writings and publications meet some baseline standard of secular orthodoxy." 515 U.S. at 844, 115 S.Ct. at 2524. So it is in this case. *Rosenberger* then repeated the description of this danger from one of the Court's first equal access cases:

> [T]he dissent fails to establish that the distinction
> [between 'religious' speech and speech 'about' religion]
> has intelligible content. There is no indication when
> "singing hymns, reading scripture, and teaching biblical
> principals" cease to be "singing, teaching, and reading"-
> -all apparently forms of "speech," despite their
> religious subject matter--and become unprotected
> "worship." . . . [E]ven if the distinction drew an

24

arguably principled line, it is highly doubtful it would lie within the judicial competence to administer. Merely to draw the distinction would require the university--and ultimately the courts--to inquire into the significance of words and practices to different religious faiths, and in varying circumstances by the same faith. Such inquiries would tend inevitably to entangle the State with religion in a manner forbidden by our cases.

Rosenberger, 515 U.S. at 845, 115 S.Ct. at 2524 (citing Widmar, 454 U.S. at 269-70, n.6, 102 S.Ct. at 274, n.6)(citations omitted).[37]

To paraphrase one court, the panel opinion would allow atheists to put on a program denouncing religion or anti-Semites to sponsor a rant against Judaism, but it would not allow religious believers of any stripe to convene or instruct the faithful in this

---

[37]   *See also* Church on the Rock v. City of Albuquerque, 84 F.3d 1273, 1278 (10th Cir. 1996), overturning a prohibition against using an otherwise publicly available senior citizens' center for religious worship. The court held that:

> ... even if the City had not previously opened the Senior Centers to presentations on religious subjects, its policy would still amount to viewpoint discrimination. Any prohibition of sectarian instruction where other instruction is permitted is inherently non-neutral with respect to viewpoint. Instruction becomes "sectarian" when it manifests a preference for a set of religious beliefs. Because there is no non-religious sectarian instruction (and indeed the concept is a contradiction in terms), a restriction prohibiting sectarian instruction intrinsically favors secularism at the expense of religion. Therefore, we conclude that the City's policy constitutes viewpoint determination.

*See also* Good News/Good Sports Club v. School District of the City of Ladue, 28 F.3d 1501, 1507 (8th Cir. 1994).

25

forum. *See* <u>Church on the Rock</u>, 84 F.3d at 1279; *see also* <u>Grace Bible Fellowship</u>, 941 F.2d at 47. This is the very essence of viewpoint discrimination.

It is unfortunate for the citizens of the Fifth Circuit that this court has seen fit to retreat from equal treatment of religious speech and to deviate from fifteen years of consistent Supreme Court jurisprudence on the subject. The St. Tammany school board was not required to open its facilities for the "welfare of the public." Once it did so, however, it could not arbitrarily discriminate against religious speakers. We dissent from the denial of rehearing *en banc.*